UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC,

                              Plaintiff,

            -against-

ALLSTATE HOME LOANS, INC. and
SHEARSON FINANCIAL NETWORK, INC.,

                              Defendants.

**ECF CASE**

Civ. No. 08-1191 (RWS)

**AFFIDAVIT OF
CHRISTOPHER A. LYNCH IN
SUPPORT OF APPLICATION
FOR DEFAULT JUDGMENT**

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

Christopher A. Lynch, being duly sworn, deposes and says:

1.      I am a member of the Bar of this Court and associated with the law firm of
THACHER PROFFITT & WOOD LLP, attorneys for Plaintiff, Credit-Based Asset Servicing and
Securitization LLC ("Plaintiff") in the above-captioned matter.

2.      I submit this affidavit pursuant to Rule 55.2(b) of the Local Civil Rules for the
Southern District of New York in support of Plaintiff's application for a Default Judgment against
Shearson Financial Network, Inc. ("Defendant").

3.      On February 5, 2008, the above-captioned action ("Action") was commenced with
the filing of the Complaint against defendant Allstate Home Loans, Inc.

4.      On March 17, 2008, Plaintiff filed its First Amended Complaint and a Summons was
issued for Defendant. A true and correct copy of the Summons and First Amended Complaint is
attached hereto as Exhibit A.

5.      On March 19, 2008, a copy of the Summons and First Amended Complaint was
properly served on Defendant at 2470 St. Rose Pkwy., Ste. 314, Henderson, Nevada 89074. Proof

such service was filed with the Clerk on March 31, 2008. A true and correct copy of such proof of service is attached hereto as Exhibit B.

6.    Defendant has failed to plead or otherwise defend this Action.

7.    The time within which Defendant was permitted to file an answer to the First Amended Complaint or otherwise move has now expired and has not been extended.

8.    On April 9, the Clerk of the Court entered a Certificate of Default against the Defendant. The Certificate of Default is attached hereto as Exhibit C.

9.    As of April 16, 2008 Plaintiff's damages sought in the Complaint are currently in excess of $2,080,062.86, as more fully set forth in the Statement of Damages, attached hereto as Exhibit D. The "Attorneys' Fees and Costs" component of the damages is more fully described in the Affidavit of John P. Doherty With Respect to Attorneys' Fees and Costs, attached hereto as Exhibit E.

10.    Within thirty (30) days following payment in full of the amount awarded by the Default Judgment, Plaintiff shall return to Defendant the Early Payment Default Loans[1] as set forth in the Agreement.

WHEREFORE, Plaintiff requests the Default Judgment, attached hereto as Exhibit F, be entered against Defendant.

By: _____

CHRISTOPHER A. LYNCH

Sworn to before me this
16th day of April 2008

_____
Notary Public
NEIL T. BLOOMFIELD
NOTARY PUBLIC, State of New York
No. 02BL6117385
Qualified in New York County
Commission Expires October 25, 2008

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Complaint.

2

**EXHIBIT A**

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
| --- | --- | --- |

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

V.

ALLSTATE HOME LOANS, INC.,
SHEARSON FINANCIAL NETWORKS, INC.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:  08-CV-1191

TO: (Name and address of Defendant)

SHEARSON FINANCIAL NETWORKS, INC.
2470 St. Rose Parkway
Suite 314
Henderson, Nevada 89074

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

THACHER PROFFITT & WOOD LLP
Richard F. Hans
John P. Doherty

Two World Financial Center
New York, New York 10281
Tel.: (212) 912-7400

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                                    MAR 1 7 2008

CLERK                                                          DATE

(By) DEPUTY CLERK

%AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                        Date                    *Signature of Server*

                                    _____
                                    *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

                Plaintiff,

         -against-

ALLSTATE HOME LOANS, INC. and
SHEARSON FINANCIAL NETWORK, INC.,

                Defendants.

**ECF CASE**

Civ. No. 08-1191 (RWS)

**FIRST AMENDED COMPLAINT**

MAR 1 7 2008

U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff Credit-Based Asset Servicing and Securitization LLC ("C-BASS" or "Plaintiff"), by its attorneys, Thacher Proffitt & Wood LLP, for its first amended complaint against defendants Allstate Home Loans, Inc. ("Allstate") and Shearson Financial Network, Inc. ("Shearson") alleges as follows:

### JURISDICTION AND VENUE

    1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

    2.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (2).

### THE PARTIES

    3.    Plaintiff C-BASS is a limited liability company organized and existing under the laws of the State of Delaware. C-BASS maintains its principal place of business at 335 Madison Avenue, New York, New York.

    4.    Upon information and belief, Defendant Allstate is a corporation organized and existing under the laws of the State of California, and maintains its principal place of business at 5 Corporate Park, Suite 100, Irvine, California.

5.     Upon information and belief, Defendant Shearson is a corporation organized and existing under the laws of the State of Nevada, and maintains its principal place of business in the state of Nevada, in the City of Las Vegas.

6.     Upon information and belief, pursuant to a certain Agreement and Share Exchange and Plan of Reorganization agreement, dated as of July 29, 2006, Defendant Shearson purchased 85% of the shares in Defendant Allstate as well as gained access and control of all of Defendant Allstate's operating assets, including, but not limited to Allstate's 33 state licenses to do business as a mortgage broker and/or banker and any monies held by a warehouse line for the benefit of Allstate.

7.     Upon information and belief, at all times material herein, Defendant Allstate was operated as if it were a division of Defendant Shearson and was in fact completely dominated and controlled by Shearson such that Allstate had no independent identity or existence of its own and its acts were the acts of Shearson.

8.     Plaintiff herein refers to Defendants Allstate and Shearson collectively as "Defendants." All references herein to "Defendant" or "Defendants" are intended to include, without limitation, each of the named Defendants.

9.     Upon information and belief, at all times herein material, each of the Defendants was the alter ego of the other, such that there was no independent identity of either of them and the actions of one were the actions of the other.

## FACTUAL ALLEGATIONS

### The Master Mortgage Loan Purchase Agreement and Related Term Sheet Agreements

10.     On or about May 1, 2004, C-BASS and Allstate (together, the "Parties") entered into a Master Mortgage Loan Purchase Agreement (the "Purchase Agreement"). A copy of the

2

Purchase Agreement is attached hereto as Exhibit 1. Exhibit 1 is hereby incorporated herein as if fully set forth.

11.    In connection with individual transactions between the Parties pursuant to the Purchase Agreement, C-BASS and Allstate also entered into Term Sheet[1] agreements dated June 3, 2004, November 24, 2004, December 8, 2004, November 17, 2005, February 24, 2006, June 8, 2006, October 11, 2006 and November 1, 2006 (collectively, the "Term Sheet Agreements," and together with the Purchase Agreement, the "Agreements").

12.    As set forth in Section 16 of the Purchase Agreement, the Parties agreed that the Agreements "shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues. . . ."

13.    As set forth in Section 16 of the Purchase Agreement, the Parties agreed that all disputes arising under the Agreements shall be submitted to, and the Parties subject themselves to, the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

**Defendants' Failure to Repurchase
Loans With Early Payment Defaults From C-BASS**

14.    Pursuant to the Agreements, Allstate from time to time offered to sell and C-BASS agreed to purchase certain mortgage loans ("Mortgage Loans") in accordance with the terms of the Agreements.

15.    Pursuant to Section 5(f) of the Purchase Agreement, as amended, Allstate agreed to repurchase any Mortgage Loan for which the first scheduled monthly payment due following

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreements.

3

the Closing Date for such Mortgage Loan was not received by C-BASS by the last day of the

month when such payment was due (hereafter "Early Payment Defaults").

16.    Certain of the Mortgage Loans experienced Early Payment Defaults (hereafter,

such Mortgage Loans shall be collectively referred to as "Early Payment Default Loans").

Attached as Exhibit 2 is a schedule which lists, among other things, the Early Payment Default

Loans, which is hereby incorporated herein as if fully set forth.

17.    Accordingly, pursuant to Section 5(f) of the Purchase Agreement, Defendants are

obligated to repurchase each Early Payment Default Loan and remit to C-BASS the Repurchase

Price (as defined in the Agreements) with respect to each Early Payment Default Loan.

18.    On April 19, 2007, C-BASS issued a written demand to Defendants to repurchase

the Early Payment Default Loans for a sum equal to the Repurchase Price on or before April 30,

2007 (the "Demand Letter"). A copy of the Demand Letter is attached hereto as Exhibit 3,

which is hereby incorporated herein as if fully set forth.

19.    In addition, prior to C-BASS's issuance of the Demand Letter, C-BASS also

notified Defendants via other communications that certain Mortgage Loans, including the Early

Payment Default Loans, were in early payment default status. In addition to the Demand Letter,

these notifications separately triggered Defendants' obligations to repurchase such Early

Payment Default Loans, pursuant to the Agreements.

20.    To date, Defendants have failed to repurchase the Early Payment Default Loans

from C-BASS, notwithstanding their clear contractual obligation to do so.

21.    The aggregate Repurchase Price for the Early Payment Default Loans, excluding

attorneys' fees and other costs and expenses, exceeds $1,766,010.29 as of January 31, 2008, plus

interest.

22.    C-BASS has performed all of its obligations under the Agreements with respect to the Early Payment Default Loans.

23.    As a result of Defendants' failure to repurchase the Early Payment Default Loans, C-BASS is required to maintain possession and maintenance of the Early Payment Default Loans, and may be exposed to any claims or losses that might be sustained by reason of ownership of each such loan.

Defendants' Failure to Make Premium Protection Payments to C-BASS

24.    Pursuant to Section 5(f) of the Purchase Agreement, as amended, Defendants agreed to pay C-BASS certain amounts constituting premium protection payments in the event that the principal due on a Mortgage Loan was prepaid in full within one year of the Cut-off Date as specified on the related Term Sheet.

25.    The principal on certain Mortgage Loans was prepaid in full within one year of the relevant Cut-Off Date. Attached as Exhibit 2 is a schedule which lists, among other things, those Mortgage Loans with principal amounts paid in full within one year of the Cut-off Date, which is hereby incorporated herein as if fully set forth.

26.    Accordingly, pursuant to Section 5(f) of the Purchase Agreement, Defendants are obligated to pay to C-BASS certain premium protection payments, the aggregate amount of which, excluding attorneys' fees and other costs and expenses, exceeds $22,078.32 as of January 31, 2008, plus interest.

Defendants' Failure to Reimburse C-BASS for Out-of-Pocket Expenses

27.    Pursuant to Sections 5(e) and 5(f) of the Purchase Agreement, as amended, in the event that Defendants are obligated to repurchase the Mortgage Loans, C-BASS is also entitled to recover from Defendants certain out-of-pocket expenses incurred by C-BASS in "transferring and servicing such Mortgage Loan[s], including, without limitation, expenses incurred for

maintenance and repairs, assessments, taxes and similar items, to the extent not paid out of an escrow account transferred by [Defendants] to" C-BASS.

28.    Defendants have failed to remit payment for C-BASS's out-of-pocket expenses despite the fact that Defendants are obligated to repurchase the Mortgage Loans and C-BASS is therefore entitled to recover these amounts.

29.    Among the expenses that C-BASS has incurred and Defendants are now obligated to pay are amounts for certain delinquent local taxes that Defendants were obligated to, and failed to, pay. Attached as Exhibit 2 is a schedule which lists, among other things, those tax payments, which is hereby incorporated herein as if fully set forth

30.    The aggregate amount of tax expenses owing from Defendants to C-BASS, excluding attorneys' fees and other costs and expenses, exceeds $6,605.68 as of January 31, 2008, plus interest.

<u>Defendants' Failure to Remit Funds Received and Held in Escrow</u>

31.    Under the Agreements, Defendants were obligated to hold certain funds belonging to C-BASS in escrow and to remit these funds to C-BASS when they became due and owing.

32.    Defendants have refused to remit these funds that are to due and owing to C-BASS despite numerous requests for payment thereof by C-BASS.

33.    The aggregate amount of funds received by Defendants and improperly withheld from C-BASS, excluding attorneys' fees and other costs and expenses, exceeds $270,396.06 as of January 31, 2008, plus interest.

34.    Included in this amount are outstanding escrow and P&I funds in the amount of $265,007.54 which are due and owing to C-BASS, and which Defendants continue to improperly withhold.

<u>Indemnification and Attorneys' Fees and Costs</u>

35.    Defendants are liable for C-BASS's attorneys fees and expenses incurred in connection with the Early Payment Default Loans and this lawsuit because:

A.    Pursuant to Sections 5(e) and 5(f) of the Purchase Agreement, the Early Payment Default Loans shall be repurchased at the "Repurchase Price" which includes, among other things, attorneys fees and expenses incurred by Purchaser in connection with any enforcement procedures or otherwise with respect to the Mortgage Loans; and

B.    Pursuant to Section 19 of the Purchase Agreement, Defendants agreed to indemnify C-BASS for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that C-BASS may sustain resulting from Defendants' breach of a representation, warranty or covenant contained within the Agreements.

<u>FIRST CLAIM FOR RELIEF</u><br>(Breach of Contract - Agreements)

36.    Plaintiff C-BASS realleges paragraphs 1 through 35 of this complaint as if fully set forth herein.

37.    Under the Agreements, Defendants agreed to repurchase the Early Payment Default Loans from C-BASS.

38.    C-BASS has demanded that Defendants repurchase the Early Payment Default Loans.

39.    Defendants have refused and failed to repurchase the Early Payment Default Loans.

40.    As a direct, proximate and actual result of Defendants' breach of their obligations to repurchase the Early Payment Default Loans, C-BASS has suffered damages in an amount to

7

be determined at trial, but which is not less than $1,766,010.29 as of January 31, 2008, plus interest.

41.    In addition, under the Agreements, Defendants agreed to make premium protection payments to C-BASS in the event that the principal due on a Mortgage Loan was prepaid in full within one year of the Cut-off Date as specified on the related Term Sheet.

42.    C-BASS has demanded that Defendants make premium protection payments on Mortgage Loans with principal amounts that were prepaid in full within one year of the Cut-off Date.

43.    Defendants have refused and failed to make premium protection payments to C-BASS.

44.    As a direct, proximate and actual result of Defendants' breach of its obligations to make premium protection payments, C-BASS has suffered damages in an amount to be determined at trial, but which is not less than $22,078.32 as of January 31, 2008, plus interest.

45.    Defendants also agreed to hold certain funds belonging to C-BASS in escrow and to remit these funds to C-BASS when they became due and owing.

46.    Defendants have refused to remit these funds that are to due and owing to C-BASS despite numerous requests for payment thereof by C-BASS.

47.    The aggregate amount of funds received by Defendants and improperly withheld from C-BASS, excluding attorneys' fees and other costs and expenses, exceeds $270,396.06 as of January 31, 2008, plus interest.

48.    Defendants have further refused to pay certain out-of-pocket expenses incurred by C-BASS despite its obligation to do so under the Agreements.

49.    As a direct, proximate and actual result of Defendants' breach of its obligations to repay C-BASS's expenses, C-BASS has suffered damages in an amount to be determined at trial, but which is not less than $6,605.68 as of January 31, 2008, plus interest.

50.    In total, as a direct, proximate and actual result of Defendants' breach of its obligations under the Agreements, C-BASS has suffered damages in an amount to be determined at trial, but which is not less than $2,065,090.35 as of January 31, 2008, plus interest.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

51.    Plaintiff C-BASS realleges paragraphs 1 through 50 of this complaint as if fully set forth herein.

52.    In consideration of the sale of the Early Payment Default Loans, Defendants received payment from C-BASS.

53.    Defendants have wrongfully refused to repurchase the Early Payment Default Loans, causing C-BASS to lose the use of those moneys due and owing, and requiring C-BASS to incur attorneys' fees to recover these costs due under the Agreements. It would be unjust and inequitable to allow Defendants to benefit in this manner.

54.    By reason of the foregoing, Defendants have been unjustly enriched at the expense of C-BASS, and C-BASS has suffered damages in an amount to be established at trial.

## THIRD CLAIM FOR RELIEF
### (Conversion)

55.    Plaintiff C-BASS realleges paragraphs 1 through 53 of this complaint as if fully set forth herein.

56.    Under the Agreements, Defendants were obligated to hold certain funds belonging to C-BASS in escrow and to remit these funds to C-BASS when they became due and owing.

57.    Defendants have refused to remit these funds that are to due and owing to C-BASS despite numerous requests for payment thereof by C-BASS.

58.    Upon information and belief, a branch manager of Allstate assumed control of and misappropriated these funds for his or her own benefit in a manner inconsistent with the terms of the Agreements.

59.    By failing to remit these funds, Defendants and/or their agent(s) have improperly converted funds belonging to C-BASS for the personal benefit of Defendants and/or their agent(s).

60.    By reason of the foregoing, C-BASS has suffered and continues to suffer damages in an amount to be established at trial.

## FOURTH CLAIM FOR RELIEF
### (Indemnification for Legal Fees and Related Costs)

61.    Plaintiff C-BASS realleges paragraphs 1 through 60 of this complaint as if fully set forth herein.

62.    Pursuant to Section 19 of the Purchase Agreement, Defendants agreed to indemnify C-BASS for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that C-BASS may sustain that are in any way related to Defendants' breach of Defendants' representations, warranties or covenants in strict compliance with the terms of the Purchase Agreement.

63.    Defendants have breached their representations and warranties and failed to observe their covenants, causing C-BASS to suffer the damages for which Defendants owe indemnity.

64.    Pursuant to Sections 5(e) and 5(f) of the Purchase Agreement, the Early Payment Default Loans shall be repurchased at the "Repurchase Price" which includes, among other

things attorneys fees and expenses incurred by Purchaser in connection with any enforcement proceedings or otherwise with respect to the Mortgage Loans.

65.    Defendants are therefore liable to C-BASS for all of C-BASS's legal fees and related costs, and all other costs, fees and expenses that C-BASS has incurred, is incurring and will incur in connection with Defendants' failure to observe and perform its obligation to repurchase the Early Payment Default Loans.

## FIFTH CLAIM FOR RELIEF
### (Specific Performance)

66.    Plaintiff C-BASS realleges paragraphs 1 through 65 of this complaint as if fully set forth herein.

67.    The Agreements are valid, enforceable contracts between Defendants and C-BASS.

68.    Under the terms of the Agreements, C-BASS and Defendants made several valid and enforceable mutual agreements.

69.    C-BASS substantially performed its obligations under the Agreements by, *inter alia,* purchasing Early Payment Default Loans from Defendants pursuant to the terms and provisions of the Agreements.

70.    C-BASS is willing and able to perform its obligations under the Agreements by, including but not limited to, delivering repurchased Early Payment Default Loans to Defendants.

71.    Upon information and belief, Defendants are able to continue to perform under the Agreements, including but not limited to, repurchasing the Early Payment Default Loans.

72.    C-BASS has suffered harm resulting from Defendants' refusal to repurchase the Early Payment Default Loans, for which there is no adequate remedy at law.

11

73.     C-BASS has demanded, and is entitled to, specific performance of Defendants' repurchase obligations under the Agreements.

74.     As a result of the foregoing breaches, pursuant to the Agreements, Defendants are obligated to pay C-BASS an amount not less than $2,065,090.35 as of January 31, 2008, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff C-BASS respectfully requests judgment against Defendants as follows:

A.     Damages in an amount to be determined at trial but not less than $2,065,090.35;

B.     Specific performance of the Agreements;

C.     Attorneys' fees and related costs, and all other costs, fees and expenses that C-BASS has incurred, is incurring and will incur in this action in connection with Defendants' failure to observe and perform its obligations under the Agreements; and

D.     Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
March 17, 2008

THACHER PROFFITT & WOOD LLP

By: _____

John P. Doherty (jdoherty@tpw.com)
Brendan E. Zahner (bzahner@tpw.com)
Christopher A. Lynch (clynch@tpw.com)
Two World Financial Center
New York, New York 10281
(212) 912-7400

*Attorneys for Credit-Based Asset
Servicing and Securitization, LLC*

12

# EXHIBIT 1

MASTER MORTGAGE LOAN PURCHASE AGREEMENT

between

ALLSTATE HOME LOANS, INC.
Seller

and

CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC
Purchaser

Residential Fixed and Adjustable Rate

First or Second Lien Mortgage Loans

Dated as of May 1, 2004

## TABLE OF CONTENTS

Page

SECTION 1.    Agreement to Purchase ...................................................................1
SECTION 2.    Mortgage Loan Schedule ................................................................1
SECTION 3.    Purchase Price; Payments ..............................................................1
SECTION 4.    Closing ............................................................................................2
SECTION 5.    Representations, Warranties and Covenants of Seller ....................3
SECTION 6.    Closing Documents ........................................................................18
SECTION 7.    Costs ...............................................................................................19
SECTION 8.    Servicing .........................................................................................19
SECTION 9.    Hazard Insurance ...........................................................................23
SECTION 10.    No Solicitation ...............................................................................24
SECTION 11.    Confidentiality ...............................................................................24
SECTION 12.    Survival of Agreement ...................................................................24
SECTION 13.    Notices ...........................................................................................24
SECTION 14.    Severability Clause .........................................................................24
SECTION 15.    Counterparts ...................................................................................25
SECTION 16.    Place of Delivery and Governing Law ...........................................25
SECTION 17.    Further Assurances .........................................................................25
SECTION 18.    Successors and Assigns; Assignment ..............................................25
SECTION 19.    Indemnification ..............................................................................25
SECTION 20.    Amendments ...................................................................................26
SECTION 21.    Interpretation ..................................................................................26
SECTION 22.    Intention of the Parties ...................................................................26
SECTION 23.    Reproduction of Documents ...........................................................26
SECTION 24.    Exhibits ...........................................................................................26
SECTION 25.    Bid Letter ........................................................................................26

[[TW: NYLEGAL:236752.3] 17999-00102  05/28/2004 12:02 PM]

<u>EXHIBITS</u>

EXHIBIT A-1        Contents of Mortgage File

EXHIBIT A-2        Contents of Servicing File

EXHIBIT B          Form of Term Sheet

    SCHEDULE ONE            Mortgage Loan Schedule

    SCHEDULE TWO            Purchase Price Schedule

    [SCHEDULE THREE    Document Deficiency Schedule]

    [SCHEDULE FOUR            Mortgage Loans without Tax Service Contracts]

EXHIBIT C          Form of Security Release Certification

EXHIBIT D          Form of Bill of Sale

EXHIBIT E          Form of Affidavit and Assignment of Claim

EXHIBIT F          Form of Bailee Letter Agreement

EXHIBIT G          Servicing Transfer Instructions

EXHIBIT H          Form of Seller's Officer's Certificate

## MASTER MORTGAGE LOAN PURCHASE AGREEMENT

This Master Mortgage Loan Purchase Agreement (the "Agreement") is entered into as of May 1, 2004 by and between Allstate Home Loans, Inc., a California corporation having an office at 5 Corporate Park, Suite 100, Irvine, California 92606-5117 ("Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company having an office at 335 Madison Avenue - 19th Floor, New York, New York 10017 ("Purchaser").

Seller desires to sell, from time to time, to Purchaser, and Purchaser desires to purchase, from time to time, from Seller on various dates specified in the related Term Sheet or such other dates as Purchaser and Seller mutually agree (each, a "Closing Date") and on terms and conditions described below, certain residential fixed and adjustable rate first or second lien mortgage loans (the "Mortgage Loans"). The Mortgage Loans shall be sold to Purchaser on a servicing released basis.

Seller and Purchaser, in consideration of the premises and the mutual agreements set forth herein and other good and valuable consideration, agree as follows:

SECTION 1. Agreement to Purchase. Seller hereby agrees to sell, and Purchaser hereby agrees to purchase, from time to time, on the terms and conditions stated herein and in the related Term Sheet executed by Purchaser and Seller in the form attached hereto as Exhibit B (the "Term Sheet") certain Mortgage Loans having an aggregate principal balance as of the date set forth as the Cut-off Date as specified on the related Term Sheet (such principal balance, the "Cut-off Date Principal Balance").

SECTION 2. Mortgage Loan Schedule. Seller and Purchaser hereby agree that the Mortgage Loans to be purchased under this Agreement on a particular Closing Date will be described in the schedule (the "Mortgage Loan Schedule") to be attached as Schedule One to the related Term Sheet.

SECTION 3. Purchase Price; Payments.

(a)     On the related Closing Date, the purchase price for the Mortgage Loans (the "Purchase Price") shall be an amount equal to (i) the amount specified on Schedule Two attached to the related Term Sheet plus (ii) with respect to any Mortgage Loans which are less than 60 days delinquent as of the related Cut-off Date (as identified on the related Term Sheet), accrued and unpaid interest to the day prior to the related Closing Date; provided that, Purchaser shall not pay more than 60 days interest with respect to any Mortgage Loan. Purchaser and Seller further agree that the Purchase Price shall be reduced by an amount equal to $50.00 per Mortgage Loan as set forth on Schedule Four attached to the related Term Sheet to compensate Purchaser for the cost of acquiring a tax service contract for each such Mortgage Loan. Seller, simultaneously with the payment of the Purchase Price, shall execute and deliver to Purchaser a Bill of Sale (as hereinafter defined) with respect to the related Mortgage Loans in the form attached hereto as Exhibit D.

(b)     On the related Transfer Date, Seller shall remit to Purchaser to the account designated in writing by Purchaser with respect to the related Mortgage Loans the positive escrow account balances maintained for the mortgagors and any suspense funds and all other

similar amounts held by Seller. Any payments required to be made by Seller pursuant to this Section 3(b) shall be made by wire transfer of immediately available funds. With respect to any Mortgage Loans which are 60 or more days delinquent as of the related Cut-off Date (as identified on the related Term Sheet), Purchaser shall not purchase any corporate or escrow advances as described in Sections 8(d) and (e) herein. With respect to any Mortgage Loans which are less than 60 days delinquent as of the related Cut-off Date (as identified on the related Term Sheet) and subject to the immediately succeeding sentence, Purchaser shall purchase the corporate and escrow advances for which Seller has provided the documentation related to such advances as described in Sections 8(d) and (e) herein and that are determined by Purchaser to be recoverable. Purchaser shall reimburse Seller for such advances within thirty (30) days of receipt of the documentation related to the advances.

(c)     Purchaser shall be entitled to all payments of principal and interest and other recoveries on the Mortgage Loans received on and after the related Cut-off Date, which at Purchaser's option shall be either (i) applied to the Purchase Price on the related Closing Date, or (ii) paid to Purchaser on the related Transfer Date. Purchaser shall not reimburse the Seller for any costs or expenses incurred by Seller with respect to the servicer of the Mortgage Loan assessing the mortgagor any delinquent payment fees that are not specifically permitted in the Mortgage or Mortgage Note, including but not limited to demand letter charges, or assessing the mortgagor interest on any advances made by the servicer of the Mortgage Loan.

SECTION 4. Closing. The closing of the purchase and sale of the Mortgage Loans identified on the Mortgage Loan Schedule accepted by Purchaser in accordance with the procedures set forth herein shall take place on the related Closing Date. Seller shall provide Purchaser with the proposed Mortgage Loan Schedule at least one (1) business day prior to the related Closing Date, and Purchaser shall have the right to accept or reject the Mortgage Loans on the proposed Mortgage Loan Schedule.

The obligation of Purchaser to purchase the Mortgage Loans on the related Closing Date as contemplated by this Agreement shall be subject to each of the following conditions:

(a)     all of the representations and warranties under this Agreement and the related Term Sheet shall be true and correct as of the related Closing Date, and no default or event which, with the giving of notice or the passage of time or both, would constitute an event of default under this Agreement and the related Term Sheet shall have occurred;

(b)     Purchaser shall have received executed copies of the closing documents specified in Section 6 of this Agreement;

(c)     Seller shall have made available for Purchaser's inspection at least five (5) business days prior to the related Closing Date, at the office of The Bank of New York, Purchaser's custodian, under a Bailee Letter Agreement (the "Bailee Letter Agreement") in the form attached hereto as Exhibit F, the contents of the Mortgage File as described in Exhibit A-1 and shall deliver to Purchaser, or its designee the Servicing File as described in Exhibit A-2 for the related Mortgage Loans in accordance with Section 8(c) of this Agreement; and

-2-

(d)    all other terms and conditions of this Agreement and the related Term Sheet shall have been complied with.

Subject to the foregoing conditions, Purchaser shall pay to Seller on the related Closing Date the related Purchase Price as determined pursuant to Section 3 of this Agreement, by wire transfer of immediately available funds to the account designated in writing by Seller. Seller shall advise Purchaser in writing at least one (1) business day prior to the related Closing Date of the account to which such funds are to be wired.

In addition, in connection with the assignment of any MERS Loan (as defined herein), Seller agrees that on or prior to each Closing Date it will cause, at its own expense, the MERS System (as defined herein) to indicate that the related Mortgage Loans have been assigned by Seller to Purchaser in accordance with this Agreement by including in such computer files the information required by the MERS System to identify Purchaser as owner of such Mortgage Loans.

SECTION 5.    Representations, Warranties and Covenants of Seller.

(a)    Seller represents and warrants to, and covenants with, Purchaser that as of each Closing Date:

(i)    It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all licenses necessary to carry on its business as now being conducted. It is licensed in, qualified to transact business in and is in good standing under the laws of the state in which any Mortgaged Property (as defined herein) is located except where the failure to be so licensed and qualified would not have a material adverse effect on its business or operations. No licenses or approvals obtained by Seller have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(ii)    It has the full power and authority (corporate and other) to hold each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and the related Term Sheet. Seller has duly authorized the execution, delivery and performance of this Agreement and the related Term Sheet, has duly executed and delivered this Agreement and the related Term Sheet, and this Agreement and the related Term Sheet constitute legal, valid and binding obligations of it, enforceable against it in accordance with their terms, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance;

-3-

(iii)   Neither the execution and delivery of this Agreement and the related Term Sheet and the other documents and agreements contemplated hereby, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the related Term Sheet and such other documents and agreements will result in the breach of any term or provision of the charter or by-laws of Seller or result in the breach of any material term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other instrument to which Seller or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject;

(iv)   It does not believe that it cannot perform each and every covenant contained in this Agreement and the related Term Sheet;

(v)    There are no actions, suits or proceedings pending or, to its knowledge, threatened or likely to be asserted against or affecting it, before or by any court, administrative agency, arbitrator or governmental body with respect to any of the transactions contemplated by this Agreement or the related Term Sheet or any other matter which may materially and adversely affect its ability to perform its obligations under this Agreement or the related Term Sheet or which may materially and adversely affect its business or prospects;

(vi)   With respect to Seller, the consummation of the transactions contemplated by this Agreement and the related Term Sheet are in the ordinary course of its business and the transfer, assignment and conveyance of the Mortgage Loans are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(vii)  The transfer of the Mortgage Loans shall be treated as a sale on the books and records of Seller, and Seller has determined that, and will treat, the disposition of the Mortgage Loans pursuant to this Agreement for tax and accounting purposes as a sale. Seller shall maintain a complete set of books and records for each Mortgage Loan which shall be clearly marked to reflect the ownership of each Mortgage Loan by Purchaser;

(viii) The consideration received by Seller upon the sale of the Mortgage Loans constitutes fair consideration and reasonably equivalent value for such Mortgage Loans;

(ix)   Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. Seller is not transferring any Mortgage Loan with any intent to hinder, delay or defraud any of its creditors;

-4-

(x)     Seller is a HUD approved mortgagee pursuant to Section 203 and Section 211 of the National Housing Act. No event has occurred, including but not limited to a change in insurance coverage, which would make the Seller unable to comply with HUD eligibility requirements or which would require notification to HUD. For the purposes hereof, HUD means the United States Department of Housing and Urban Development, or any successor thereto; and

(xi)    To the extent that any Mortgage Loans sold by Seller hereunder are MERS Loans, Seller is in good standing, and will comply in all material respects with the rules and procedures of Mortgage Electronic Registration Systems, Inc., ("MERS"), a corporation organized and existing under the laws of the State of Delaware, or any successor thereto in connection with the servicing of any Mortgage Loan registered with MERS (a "MERS Loan") on the system of recording transfers of mortgages electronically maintained by MERS (the "MERS System") for as long as such Mortgage Loans are registered with MERS.

(b)     Seller represents and warrants to, and covenants with, Purchaser with respect to each Mortgage Loan as of the related Closing Date (or such other date as set forth herein) for such Mortgage Loan:

(i)     The information required in Schedule One set forth on the Mortgage Loan Schedule is complete, true and correct and the servicing information provided to Purchaser with respect to the Mortgage Loans as of the Transfer Date (as defined herein) is true and correct in all material respects;

(ii)    The mortgagor's real property securing repayment of the related Mortgage Note (as defined herein), consists of a fee simple interest or a Ground Lease (as defined herein) in a single parcel of real property improved by a (A) detached one-family dwelling, (B) detached two-to four- family dwelling, (C) one-family unit in a Fannie Mae ("FNMA") eligible condominium project, (D) detached one-family dwelling in a planned unit development which is not a co-operative and which meets the eligibility requirements of FNMA, or (E) mobile home or manufactured dwelling which constitutes real property (the "Mortgaged Property") and is located in one of the fifty states of the United States of America or the District of Columbia;

(iii)   There are no delinquent real estate taxes, ground rents, water charges, sewer rents, Ground Lease rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments or other outstanding charges affecting the Mortgaged Property;

(iv)    The terms of the note or other evidence of indebtedness of the mortgagor secured by the Mortgaged Property (in each case, the "Mortgage Note")

-5-

and the mortgage or other instrument creating a first or second lien on the Mortgaged Property (in each case, a 'Mortgage') have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, the substance of which waiver, alteration or modification is reflected on the Mortgage Loan Schedule and has been approved by the primary mortgage guaranty insurer, if any, and the title insurer, to the extent required by the related policy; no instrument of waiver, alteration or modification has been executed, and no mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage guaranty insurer, if any, and the title insurer, to the extent required by the related policy and which assumption agreement is part of the Mortgage File or the Servicing File and the terms of which are reflected in the Mortgage Loan Schedule;

(v)     The servicing and collection practices with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage servicing business, as conducted by prudent mortgage lending institutions which service mortgage loans of the same type in the jurisdiction in which the Mortgaged Property is located and in accordance with the terms of the Mortgage Note, Mortgage and other loan documents, whether such servicing was done by Seller, its affiliates or any servicing agent of any of the foregoing; the servicer of the Mortgage Loan has not assessed the mortgagor any delinquent payment fees that are not specifically permitted in the Mortgage or Mortgage Note, including but not limited to demand letter charges, or assessed the mortgagor interest on any advances made by the servicer;

(vi)    The Mortgage Note, the Mortgage and other agreements executed in connection therewith are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law) and free from any right of offset, counterclaim, rescission or other claim or defense, including the defense of usury. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The obligor under the Mortgage Note is a natural person;

(vii)   The Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument

[TPW: NYLEGAL:736352.3] 17999-00302  05/28/2004 12:02 PM

been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(viii)    The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any improvements and as to disbursements of any escrow funds thereof have been complied with or any incomplete improvements are immaterial in nature or are weather related and do not significantly affect the value of the Mortgaged Property and no repair escrow has been established with respect to such incomplete improvements. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage have been paid, and the Mortgagor is not entitled to any refund of any amounts paid or due to the Mortgagee pursuant to the Mortgage Note or Mortgage;

(ix)    Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly or indirectly, for the payment of any amount required by the Mortgage Note or Mortgage;

(x)    The related Mortgage is a valid and enforceable first or second lien on the Mortgaged Property, which Mortgaged Property is free and clear of all encumbrances and liens having priority over the lien of the Mortgage except for (A) liens for real estate taxes and special assessments not yet due and payable, (B) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the Mortgage Loan, (C) other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property and (D) with respect to any second lien Mortgage Loan, the lien of the related first mortgage loan secured by the Mortgaged Property. The Mortgage Note and the Mortgage have not been assigned or pledged, other than to lenders whose liens will be released prior to the Closing Date or simultaneously with Purchaser's purchase hereunder, on the Closing Date, pursuant to a duly executed Security Release in the form of Exhibit C (the "Security Release Certification"). Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, existing and enforceable first or second lien and first or second priority security interest on the property described therein. As of the Closing Date, Seller is the sole owner thereof and has full right to transfer and sell the Mortgage Loans to Purchaser free and clear of any lien or encumbrance equity, charge, claim or other security interest;

-7-

(xi)     If such Mortgage Loan is indicated on the Mortgage Loan Schedule as having primary mortgage insurance, such Mortgage Loan is covered by a primary mortgage insurance policy as to the principal amount of the Mortgage Loan in excess of the portion required by FNMA of the Appraised Value (as defined herein) of the Mortgaged Property at the time of origination of the Mortgage. Such primary mortgage insurance policy is in full force and effect and the related Mortgage obligates the mortgagor to maintain such insurance and to pay all premiums and charges in connection therewith. The mortgage interest rate for the Mortgage Loan does not include any such insurance premium. Appraised Value means with respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of FNMA and the Federal Home Loan Mortgage Corporation or any successor thereto ("FHLMC"), and (ii) the purchase price paid for the related Mortgaged Property by the mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such refinanced Mortgage Loan at the time of origination of such refinanced Mortgage Loan by an appraiser who met the minimum requirements of FNMA and FHLMC;

(xii)    There has been no error, omission, fraud, dishonesty, misrepresentation, negligence or similar occurrence on the part of any person, including without limitation the mortgagor, any appraiser, any builder or developer, or any other party in connection with the solicitation of the Mortgage Loan, the origination of the Mortgage Loan, the application of any insurance in relation to such Mortgage Loan or in connection with the sale of such Mortgage Loan to Purchaser, and there are no circumstances existing with respect to the Mortgage Loan which would permit the primary mortgage guaranty insurer to deny coverage under any policy;

(xiii)   The Mortgage Loan is covered by an American Land Title Association lender's title insurance policy or other generally acceptable form of policy of insurance acceptable to prudent mortgage lending institutions, issued by a title insurer acceptable to prudent mortgage lending institutions and qualified to do business in the jurisdiction where the Mortgaged Property is located (or by an attorney's abstract and opinion of title if the Mortgaged Property is located in Iowa), insuring Seller, its successors and assigns, as to the first or second priority lien of the Mortgage, as indicated on the Mortgage Loan Schedule, in the original principal amount of the Mortgage Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage interest rate and monthly payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and

-8-

against encroachments by or upon the Mortgaged Property or any interest therein. Seller is the sole insured of lender's title insurance policy, and lender's title insurance policy is in full force and effect. No claims have been made under the lender's title insurance policy, and neither Seller nor any prior holder has done, by act or omission, anything which would impair the coverage of the lender's title insurance policy;

(xiv) In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the mortgagor;

(xv) At the time of origination of the Mortgage Loan, no improvement located on or being part of the Mortgaged Property was in violation of any applicable zoning law or regulation and no such improvement is currently in violation of any applicable zoning law or regulation. No improvements on adjoining properties encroach upon the Mortgaged Property. The Mortgaged Property is lawfully occupied under applicable law; all inspections, licenses and certificates required in connection with the origination of any Mortgage Loan with respect to the occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(xvi) The assignment of Mortgage is in recordable form, except for the insertion of the name of the assignee, and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. The endorsement of the Mortgage Note is valid, legal and enforceable under the laws of the jurisdiction in which the Mortgaged Property is located;

(xvii) None of the Mortgage Loans are subject to a "buydown agreement";

(xviii) The Mortgaged Property securing the Mortgage Loan is insured by an insurer generally acceptable to prudent mortgage lending institutions against loss by fire and such hazards, including but not limited to damage by windstorm, as are covered under a standard extended coverage endorsement and such other hazards as are customary in the area where the Mortgaged Property is located; if the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the project; all such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid; if the Mortgaged Property is in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available)

-9-

a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect which policy conforms to the requirements of FNMA and FHLMC. All such insurance policies contain a standard mortgagee clause naming Seller, its successors and assigns as mortgagee and all premiums thereon have been paid. The Mortgage obligates the mortgagor thereunder to maintain all such insurance at the mortgagor's cost and expense, and on the mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at mortgagor's cost and expense and to seek reimbursement therefor from the mortgagor;

(xix)   If the Mortgage Loan provides that the interest rate on the principal balance of the related Mortgage Loan may be adjusted, all of the terms of the related Mortgage pertaining to interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance have been made in accordance with the terms of the related Mortgage Note and applicable law and are enforceable and such adjustments will not affect the priority of the Mortgage lien;

(xx)    The Mortgaged Property complies with all applicable laws, rules and regulations, including but not limited to those relating to environmental matters, including but not limited to those relating to radon, asbestos and lead paint and neither the Seller nor, to the Seller's knowledge, the mortgagor, has received any notice of any violation or potential violation of such law;

(xxi)   The Mortgaged Property is free of damage and waste and there is no proceeding pending or, to the best of Seller's knowledge, threatened for the partial or total condemnation thereof;

(xxii)  Each agreement with a servicer of the Mortgage Loan, if any, provides for the termination of the servicing rights relating to the Mortgage Loan on the related Transfer Date, without the payment of any termination fee or other expense by Purchaser;

(xxiii) To the extent required under applicable law, each originator and subsequent mortgagee or servicer of the Mortgage Loan complied with all licensing requirements and was authorized to transact and do business in the jurisdiction in which the related Mortgaged Property is located at all times when it held or serviced the Mortgage Loan. Any and all requirements of any federal, state or local laws or regulations, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory lending, abusive lending, fair credit reporting, unfair collection practice, equal credit opportunity, fair housing and disclosure laws and regulations, applicable to the solicitation, origination, collection and servicing of such Mortgage Loan have been complied with in all material respects; and any obligations

-10-

of the holder of the Mortgage Note, Mortgage and other loan documents have been complied with in all material respects and the consummation of the transaction contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for inspection of Purchaser or its designee, and shall deliver to Purchaser or its designee, upon two business days' request, evidence of compliance with such requirements;

(xxiv)   The mortgagor has received all disclosure materials required by applicable law with respect to the making of fixed rate mortgage loans in the case of fixed rate Mortgage Loans, and adjustable rate mortgage loans in the case of adjustable rate Mortgage Loans and rescission materials with respect to refinanced Mortgage Loans, and has executed any required consents that it has reviewed such information, which consents are and will remain in the Mortgage File;

(xxv)   The related Mortgage Note or Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder adequate for the realization against the Mortgaged Property of the benefits of the security, including realization by judicial, or, if applicable, non-judicial foreclosure, and in the case of a Mortgage designated as a deed of trust, by trustee's sale, and there is no homestead or other exemption available to the mortgagor which would interfere with such right to foreclosure;

(xxvi)   There is no action, suit or proceeding pending, or to the best of Seller's knowledge, threatened or likely to be asserted with respect to the Mortgage Loan against or affecting Seller before or by any court, administrative agency, arbitrator or governmental body;

(xxvii)   Except for any payment delinquency indicated on the Mortgage Loan Schedule, there is no default, breach, violation or event of acceleration existing under the related Mortgage Note or Mortgage, and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(xxviii)   No action, inaction, or event has occurred and no state of fact exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to coverage under any applicable hazard insurance policy, PMI Policy or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by Seller or any designee of Seller or any corporation in which Seller or any officer, director, or employee had a financial interest at the time of placement of such insurance;

-11-

(xxix)  No Mortgage Loan is subject to the provisions of the Homeownership and Equity Protection Act of 1994 as amended or is considered a "high cost," "predatory" or "abusive" loan (or a similarly designated loan using different terminology) under any other state, county or municipal laws or ordinances, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the City of Oakland, California Anti-Predatory Lending Ordinance No. 12361, the New Jersey Home Ownership Security Act of 2002 (the "NJ Act") or any other statute or regulation providing "assignee" or "originator" liability to holders of such mortgage loans;

(xxx)  Each Mortgage Loan was originated by Seller or by a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by HUD;

(xxxi)  Except as set forth on Schedule Four, the Mortgage Loan has a fully assignable life of loan tax service contract with Transamerica Real Estate Tax Service or First American Real Estate Tax Service which may be assigned without the payment of any fee by Purchaser;

(xxxii)  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(xxxiii)  Principal payments on the Mortgage Loan commenced no more than sixty days after the proceeds of the Mortgage Loan were disbursed. With respect to each Mortgage Loan, the Mortgage Note is payable each month on the day identified on the Mortgage Loan Schedule in monthly payments, which, except with respect to any Mortgage Loan which is identified on the Mortgage Loan Schedule as a balloon mortgage loan (each, a "Balloon Mortgage Loan"), in the case of a fixed rate Mortgage Loan, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage interest rate, and in the case of an adjustable rate Mortgage Loan, are changed on each adjustment date, and in any case, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage interest rate. In the case of a Balloon Mortgage Loan, the Mortgage Note is payable in monthly payments based on a thirty (30) year amortization schedule and a final monthly payment substantially greater than the preceding monthly payment which is sufficient to amortize the remaining principal balance of the Balloon Mortgage Loan. No adjustable rate Mortgage Loan is convertible to a fixed rate Mortgage Loan. The Mortgage Note does not permit negative amortization;

(xxxiv)  The mortgagor has not notified Seller and Seller has no knowledge of any relief requested or allowed to the mortgagor under the Servicemembers Civil Relief Act or similar state laws;

(xxxv)  The Mortgage Loan was underwritten in accordance with the underwriting standards of Seller in effect at the time the Mortgage Loan was originated which underwriting standards satisfy the standards of prudent mortgage lenders in the secondary market; and the Mortgage Note and Mortgage are on forms acceptable to FNMA and FHLMC;

(xxxvi)  The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage on the Mortgaged Property and the security interest of any applicable security agreement or chattel mortgage referred to in (x) above;

(xxxvii)  The Mortgage File contains an appraisal of the related Mortgaged Property which satisfied the standards of FNMA and FHLMC and was made and signed, prior to the approval of the Mortgage Loan application, by a qualified appraiser, duly appointed by Seller, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and who met the minimum qualifications of FNMA and FHLMC.  Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

(xxxviii)  No Mortgage Loan was made in connection with (A) the construction or rehabilitation of a Mortgaged Property or (B) facilitating the trade-in or exchange of a Mortgaged Property;

(xxxix)  With respect to escrow deposits and escrow payments, if any, all such payments are in the possession of, or under the control of, Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or escrow payments or other charges or payments due Seller have been capitalized under any Mortgage or the related Mortgage Note and no such escrow deposits or escrow payments are being held by Seller for any work on a Mortgaged Property which has not been completed;

(xl)  Any principal advances made to the mortgagor prior to the related Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to FNMA and

-13-

FHLMC. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(xli) Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgaged Property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to cause the Mortgage Loan to be an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan;

(xlii) No Mortgage Loan had a Loan-to-Value Ratio or a Combined Loan-to-Value Ratio (each as defined herein) at origination in excess of 100%. Loan-to-Value Ratio means with respect to any Mortgage Loan as of any date of determination, the ratio on such date of the outstanding principal amount of the Mortgage Loan to the Appraised Value of the Mortgaged Property. Combined Loan-to-Value Ratio means with respect to any Mortgage Loan secured by a second lien on the Mortgaged Property securing the related Mortgage Note, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the Mortgage Loan, plus (b) the unpaid principal balance of the related first mortgage loan secured by the Mortgaged Property as of such date, and the denominator of which is the Appraised Value of the related Mortgaged Property;

(xliii) No predatory or deceptive lending practices, including but not limited to, the extension of credit to the mortgagor without regard for the mortgagor's ability to repay the Mortgage Loan and the extension of credit to the mortgagor which has no apparent benefit to the mortgagor, were employed by the originator of the Mortgage Loan in connection with the origination of the Mortgage Loan. No mortgagor was required to purchase single premium credit life insurance, disability insurance or similar insurance in connection with the origination of the Mortgage Loan;

(xliv) The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(xlv) The Mortgage Loan complies with all applicable consumer credit statutes and regulations, including, without limitation, the respective Uniform Consumer Credit Code laws in effect in Colorado, Idaho, Indiana, Iowa, Kansas, Maine, Oklahoma, South Carolina, Utah and Wyoming, has been originated by a properly licensed entity, and in all other respects, complies with all of the material requirements of any such applicable laws;

(xlvi) None of the Mortgage Loans is a refinancing of a zero interest rate or low interest loan made by a governmental agency or non-profit organization;

-14-

(xlvii)    With respect to each Mortgage Loan that is a simple interest Mortgage Loan, the Mortgage Loan is identified on the Mortgage Loan Schedule as a simple interest Mortgage Loan, the Mortgage Loan is required to be serviced as a simple interest mortgage loan pursuant to the terms of the related Mortgage Note, and the servicing and collection practices used in connection therewith have been in accordance with legal, proper, prudent and customary practices for servicing simple interest mortgage loans;

(xlviii)    With respect to each Mortgage Loan that is secured in whole or in part by the interest of the mortgagor as a lessee under a ground lease of the related Mortgaged Property (a "Ground Lease") and not by a fee interest in such Mortgaged Property:

a.    The mortgagor is the owner of a valid and subsisting interest as tenant under the Ground Lease;

b.    The Ground Lease is in full force and effect, unmodified and not supplemented by any writing or otherwise;

c.    The mortgagor is not in default under any of the terms thereof and there are no circumstances which, with the passage of time or the giving of notice or both, would constitute an event of default thereunder;\

d.    The lessor under the Ground Lease is not in default under any of the terms or provisions thereof on the part of the lessor to be observed or performed;

e.    The term of the Ground Lease exceeds the maturity date of the related Mortgage Loan by at least ten years;

f.    The Ground Lease or a memorandum thereof has been recorded and by its terms permits the leasehold estate to be mortgaged. The Ground Lease grants any leasehold mortgagee standard protection necessary to protect the security of a leasehold mortgagee;

g.    The Ground Lease does not contain any default provisions that could give rise to forfeiture or termination of the Ground Lease except for the non-payment of the Ground Lease rents;

h.    The execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, the Ground Lease; and

i.    The Ground Lease provides that the leasehold can be transferred, mortgaged and sublet an unlimited number of times either without restriction or on payment of a reasonable fee and delivery of reasonable documentation to the lessor.

(xlix)    No Mortgage Loan originated on or after October 1, 2002 and prior to March 7, 2003 is subject to the Georgia Fair Lending Act (OGCA Sections 7-6A-1, et. seq.), as such Act may be amended from time to time;

(l)    With respect to any first lien Mortgage Loan, the Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(li)    No mortgage loan which is a second lien was originated at the same time or otherwise in connection with any first lien Mortgage Loan except to the extent that Seller has disclosed the existence of the second lien mortgage loan to Purchaser;

(lii)    The Mortgage Loan documents with respect to each Mortgage Loan subject to prepayment penalties (i) specifically authorizes such prepayment penalties to be collected and such prepayment penalties are permissible and enforceable and were originated in accordance with the terms of the related Mortgage Loan documents and all applicable state, federal and local law (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally or the collectability thereof may be limited due to acceleration in connection with a foreclosure) and (ii) include all necessary documentation to determine the amount of the prepayment penalty to be collected;

(liii)    Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA PATRIOT Act of 2001 (collectively, the "Anti-Money Laundering Laws"); Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable mortgagor and the origin of the assets used by the said mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable mortgagor for purposes of the Anti-Money Laundering Laws; no Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(liv)    No Mortgage Loan is a "manufactured housing loan" pursuant to the NJ Act, and one hundred percent of the amount financed of any purchase

-16-

money second lien Mortgage Loan subject to the NJ Act was used for the purchase of the related Mortgaged Property;

(lv)    No points, fees or similar charges are required to be reimbursed to a mortgagor upon a prepayment in full of the related Mortgage Loan;

(lvi)    No mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating to in any way the Mortgage Loan transaction; and

(lvii)    The Mortgage File has been and the Servicing File will be delivered to Purchaser or its designee in accordance with the terms of this Agreement.

(c)    It is understood and agreed that the representations and warranties set forth in this Section 5 shall survive the sale and delivery of the Mortgage Loans to Purchaser and shall inure to the benefit of Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or assignment of Mortgage or any examination or failure to examine any Mortgage File.

(d)    For the purposes of this Agreement, (i) the term "to Seller's knowledge," or "to its knowledge" means that Seller reasonably believes such representation or warranty to be true, and has no actual knowledge or notice that such representation or warranty is inaccurate or incomplete, but that Seller, consistent with the standard of care exercised by prudent lending institutions originating assets of the type to which that representation or warranty applies, has no knowledge of any facts or circumstances that would render reliance thereon unjustified without further inquiry; and (ii) "to the best of Seller's knowledge," means that to Seller's knowledge, the representation or warranty is not incomplete or inaccurate, and Seller has conducted a reasonable inquiry (consistent with the standard of care exercised by prudent lending institutions originating assets of the type to which that representation or warranty applies) to assure the accuracy and completeness of the applicable statement. With respect to any representations and warranties made by Seller, in the event that it is discovered that the circumstances with respect to the Mortgage Loan are not accurately reflected in such representation and warranty notwithstanding the actual knowledge or lack of knowledge of Seller, then, notwithstanding that such representation and warranty is made "to the best of Seller's knowledge," or in reliance on or based on other information, there shall be a breach of such representation and Seller shall cure such breach or repurchase the affected Mortgage Loan as provided in Section 5(e) hereof.

(e)    Upon discovery by either Seller or Purchaser of a breach of any of the foregoing representations and warranties as set forth in this Section 5 which adversely affects the value of the Mortgage Loans or the interest of Purchaser (or which adversely affects the interests of Purchaser in the Mortgage Loan in the case of a representation or warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other. Within sixty (60) days from discovery or its receipt of notice of any such breach of a representation or warranty, Seller shall cure such breach in all material respects or, at the option of Purchaser, shall repurchase the ownership interest in such Mortgage Loan at a repurchase price (the "Repurchase Price") equal to the related amount specified on Schedule Two to the related Term Sheet, less any principal payments received by Purchaser, plus Purchaser's reasonable and customary out-of-pocket expenses incurred by Purchaser in transferring and

-17-

servicing such Mortgage Loan, including, without limitation, expenses incurred for maintenance and repairs, assessments, taxes and similar items, to the extent not paid out of an escrow account transferred by Seller to Purchaser, and attorney's fees and expenses incurred by Purchaser in connection with any enforcement procedures or otherwise with respect to such Mortgage Loan or the transfer of such Mortgage Loan to Seller or Purchaser and an additional amount equal to the rate of interest borne by the Mortgage Loan multiplied by the outstanding principal balance of such Mortgage Loan from the date interest was paid through on such Mortgage Loan to the last day of the month such Mortgage Loan is repurchased. Purchaser shall release its interest in the Mortgage Loan promptly upon its receipt of the Repurchase Price and shall immediately effect the reconveyance of such Mortgage Loan to Seller.

(f)    In the event that (i) the principal due on a Mortgage Loan is prepaid in full within one year of the related Cut-off Date, then Seller shall pay to Purchaser within ten business days of Purchaser notifying Seller of such prepayment an amount equal to the product of (A) the amount of such prepayment, times (B) the excess, if any, of the purchase price percentage, as set forth on Schedule Two, over 100% or (ii) the first or second scheduled monthly payment due on any Mortgage Loan is not or was not made by the related mortgagor by the last day of the month in which it is or was due, such Mortgage Loan shall be repurchased by Seller at the Repurchase Price set forth in Section 5(c) above.

SECTION 6.  Closing Documents.  (a) The closing documents to be delivered on or prior to the initial Closing Date (the "Closing Documents") shall consist of each of the following:

(i)       four (4) fully executed original copies of this Agreement, including all exhibits hereto;

(ii)      one (1) fully executed original of the Bailee Letter Agreement;

(iii)     one (1) fully executed original of the Initial Trust Receipt issued pursuant to the Bailee Letter Agreement;

(iv)      one (1) fully executed original of an officer's certificate in the form attached hereto as Exhibit H, including all attachments thereto;

(v)       an original or a certified copy of a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the related Mortgage Loans were acquired by Seller by merger or acquired or originated by Seller while conducting business under a name other than its present name, which shall be delivered by the Closing Date;

(vi)      four (4) fully executed original copies of the related Term Sheet, including all exhibits thereto, in the form attached hereto as Exhibit B (the "Term Sheet");

(vii)     those documents set forth on Exhibit A-1 hereto for the related Mortgage Loans;

-18-

(viii) security releases from any warehouse lender with a lien on the related Mortgage Loans in the form attached hereto as <u>Exhibit C</u>;

(ix) a Bill of Sale for the Mortgage Loans in the form attached hereto as <u>Exhibit D</u>;

(x) a computer readable transmission of the payment history for each Mortgage Loan for the past twelve months; and

(xi) such other documents as may be specified in the related Term Sheet.

(b) The Closing Documents for the Mortgage Loans to be purchased on each subsequent Closing Date shall consist of each of the items specified in Subsection (a)(iii) through and including Subsection (a)(xi) above. With respect to the item specified in Subsection 6(a)(iv), such item shall only be delivered at Purchaser's request on subsequent Closing Dates.

The documents specified in Subsection 6(a)(vii) hereof for each Mortgage Loan shall be delivered by Seller to Purchaser or its designee at least five (5) business days prior to the related Closing Date.

SECTION 7. <u>Costs</u>. Each party will pay any commissions it has incurred and the fees of its attorneys in connection with the negotiations for, documenting of and closing of the transactions contemplated by this Agreement and each Term Sheet. If Purchaser requests the contents of the Mortgage File which have not been previously delivered hereunder, the original contents of such Mortgage File will be delivered by Seller. Seller will pay all costs and expenses incurred in connection with the preceding sentence. Seller shall be responsible for, and shall bear all fees and expenses related to, the recordation of assignments of Mortgage from Seller to Purchaser with respect to the Mortgage Loans. Seller shall be responsible for and shall bear all fees and expenses related to the recordation of any intervening assignments of Mortgage with respect to the Mortgage Loans.

With respect to foreclosure costs and expenses for any Mortgage Loan, including attorneys' fees, Seller shall be responsible for all expenses for services rendered prior to the related Closing Date. With respect to foreclosure costs and expenses for any Mortgage Loan, including attorney's fees, Purchaser shall be responsible for all expenses for services rendered on or after the related Closing Date; provided, however, that Purchaser's prior consent shall be required with respect to the institution of any such foreclosure proceeding or proceedings to modify any Mortgage Loans. Seller and Purchaser hereby agree that Purchaser may continue any proceeding in Seller's name with respect to any Mortgage Loan if necessary to prevent a material adverse effect on Purchaser's interests with respect thereto or a delay in such proceeding.

SECTION 8. <u>Servicing</u>. The Mortgage Loans are being sold on a servicing released basis. On the date specified in the related Term Sheet, Purchaser, or its designee, shall assume all servicing responsibilities related to the Mortgage Loans and Seller shall cease all servicing responsibilities related to the Mortgage Loans (the date of the actual transfer of servicing responsibilities for any Mortgage Loan being herein referred to as the "<u>Transfer Date</u>").

-19-

During the period between the related Cut-off Date and the related Transfer Date, Seller shall service the related Mortgage Loans for the benefit of Purchaser in accordance with the terms of the related Mortgage and Mortgage Note and shall service the related Mortgage Loans in order to protect Purchaser's interest in such Mortgage Loans to the extent that a reasonably prudent servicer would for mortgage loans of the same type in the applicable jurisdiction and in compliance with all applicable laws, rules and regulations and the loan documents. During the period between the related Closing Date and the related Transfer Date, Seller shall, at its cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to Purchaser, or its designee, including but not limited to the following:

(a)    Notice to Mortgagors.    Mail to the mortgagor of each Mortgage a letter advising such mortgagor of the transfer of the servicing of the related Mortgage Loan to Purchaser, or its designee, in accordance with the Cranston Gonzalez National Affordable Housing Act of 1990 as the same may be amended from time to time, provided, however, the content and format of the letter shall have the prior approval of Purchaser. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(b)    Notice to Taxing Authorities and Insurance Companies.    Transmit to the applicable taxing authorities and insurance companies (including primary mortgage insurance policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to Purchaser from and after the related Transfer Date. Seller shall provide Purchaser with copies of all such notices no later than the related Transfer Date.

(c)    Delivery of Servicing Records.    On or prior to the related Transfer Date, forward to Purchaser, or its designee, all servicing records, the Servicing File and the Mortgage File in any servicer's possession relating to each related Mortgage Loan including, but not limited to, the appraisal, loan application and underwriting file obtained in connection with the origination of the related Mortgage Loan, as well as a payment history for the related Mortgage Loan for the past five (5) years or in the case of a Mortgage Loan originated within the past five years, since the origination of such Mortgage Loan.

(d)    Escrow Payments.    On the related Transfer Date provide Purchaser with an accounting statement of the escrow and other payments, for taxes, governmental assessments, insurance premiums, security deposits, water, sewer and municipal charges, and suspense balances and loss draft balances sufficient to enable Purchaser to reconcile the amount of such payment with the accounts of the related Mortgage Loans.

(e)    Corporate Advances.    On the related Transfer Date, provide Purchaser, or its designee, with copies of all receipts, invoices and bills pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and other corporate advances along with a loan level report providing detail on each expense paid by Seller. In addition, Seller shall forward on a weekly basis all receipts, invoices and bills pertaining to foreclosure expenses, attorney's fees, bankruptcy fees and other corporate advances, received by Seller after the related Transfer Date. Purchaser and Seller acknowledge that the amount of the escrow and corporate advances (as

-20-

described in Sections 8(d) and 8(e)) may vary from the amount shown on the Mortgage Loan Schedule to reflect activity occurring after the related Closing Date.

(f)     Payoffs and Assumptions.  On or prior to the related Transfer Date, provide to Purchaser, or its designee, copies of all assumption and payoff statements generated with respect to the Mortgage Loans from the period beginning sixty (60) days prior to the related Transfer Date until the related Transfer Date.

(g)     Payments Received Prior to the Transfer Date.  Prior to the related Transfer Date all payments received by Seller on each Mortgage Loan shall be properly applied by Seller to the account of the particular mortgagor.  Any unapplied funds and suspense payments shall be wire transferred to Purchaser on the related Transfer Date and shall be applied by Purchaser as deemed appropriate in Purchaser's sole discretion.  In the event the related Transfer Date is more than 30 days following the related Closing Date, in addition to such related Transfer Date payment, Seller shall remit to Purchaser on the fifth business day of each month all amounts received with respect to the Mortgage Loans which have not previously been remitted.

(h)     Payments Received After the Transfer Date.  The amount of any payments received by Seller after the related Transfer Date with respect to the related Mortgage Loans shall (i) in the case of payments received within thirty days of the related Transfer Date, be forwarded to Purchaser by overnight mail or courier on the date of receipt and (ii) in the case of payments received thereafter, be forwarded to Purchaser on a weekly basis.  Notwithstanding the foregoing, any payment received by Seller for the purposes of a full payoff and received within ninety days of the related Transfer Date shall be forwarded to Purchaser by courier or overnight mail on the date of receipt.  Seller shall notify Purchaser of the particulars of such payment, which notification requirements shall be satisfied if Seller forwards with the payment sufficient information to permit appropriate processing of the payment by Purchaser and shall provide necessary and appropriate legal application of such payments which shall include, but not be limited to, endorsement of such payment to Purchaser or equivalent substitute payment with the particulars of the payment such as the account number, dollar amount, date received and any special mortgagor application instructions.

(i)     Misapplied Payments.  Misapplied payments shall be processed as follows:

(i)     All parties shall cooperate in correcting misapplication errors;

(ii)     The party receiving notice of a misapplied payment occurring prior to the related Transfer Date shall immediately notify the other party;

(iii)     If a misapplied payment which occurred prior to the related Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in any accounts established for the purpose of depositing payments with respect to the Mortgage Loans, Seller shall be liable for the amount of such shortage.  Seller shall reimburse Purchaser for the amount of such shortage within thirty (30) days after receipt of written demand therefor from Purchaser;

-21-

(iv)    If a misapplied payment which occurred prior to the related Transfer Date has created an incorrect Purchase Price as the result of an inaccurate outstanding principal balance, a check shall be issued to the party disadvantaged by the incorrect payment application within five (5) business days after notice therefor by the other party; and

(v)    Any check issued under the provisions of this Section 8 shall be accompanied by a statement indicating the corresponding Seller and/or Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments.

(j)    <u>Books and Records</u>.  On the related Transfer Date, the books, records and accounts of Seller with respect to the related Mortgage Loans shall be in accordance with all applicable industry standards, and with all additional Purchaser requirements as to which Seller has received notice.

(k)    <u>Reconciliation</u>  On or prior to the related Transfer Date, with respect to the related Mortgage Loans, reconcile principal balances and make any monetary adjustments required by Purchaser.  Any such monetary adjustments will be transferred between Seller and Purchaser as appropriate.

(l)    <u>IRS Forms</u>.  File, as and when required by law, all IRS forms 1099, 1099A, 1098 or 1041 and K-1 in relation to the servicing and ownership of the Mortgage Loans for the portion of such year the Mortgage Loans were serviced by Seller.  Seller shall provide copies of such forms to Purchaser upon request and Seller shall reimburse Purchaser for any costs or penalties incurred by Purchaser due to Seller's failure to comply with this paragraph.

(m)    <u>Consultation with Purchaser</u>.  During the period between the related Cut-off Date and the related Transfer Date, consult with Purchaser (i) prior to instituting any new foreclosure proceedings or seeking bankruptcy relief on any Mortgage Loan or (ii) with respect to any default expenditures incurred (exclusive of property inspection expenditures, loss mitigation expenditures or loss mitigation actions taken) relating to any Mortgage Loan.  Seller shall contact Mr. Steve Staid at (713) 960-9676 with respect to any consultations hereunder.

(n)    <u>Transfer of Servicing</u>.  On the related Transfer Date Seller shall transfer servicing of the related Mortgage Loans to Purchaser pursuant to the terms of this Agreement and the procedures set forth in the Servicing Transfer Instructions attached hereto as <u>Exhibit G</u>, as amended from time to time by Purchaser.  The provisions of the Servicing Transfer Instructions shall be deemed incorporated in this Agreement and the related Term Sheet, and, in the event of any conflict between the provisions of the Servicing Transfer Instructions, this Agreement and the related Term Sheet, the Agreement shall control.  At Purchaser's option and upon reasonable notice, Seller shall effect the transfer of servicing for the related Mortgage Loans by means of a "tape to tape" transfer.  All information provided to Purchaser or its designee shall be provided electronically.  Seller shall pay any costs and expenses Purchaser incurs related to the manual transfer of any information to Purchaser, or its designee.

(o)    <u>Mortgage Loans in Litigation</u>.  On or prior to the related Transfer Date:

-22-

(i)     deliver written notification to Purchaser, pursuant to Section 13, of the Mortgage Loans in litigation on the related Transfer Date including the names and addresses of all parties involved in such litigation and Seller shall deliver to Purchaser all documents related to such litigation.

(ii)    notify the clerk of the court and all counsel of record involved in such litigation that ownership of the Mortgage Loan in question has been transferred from Seller to Purchaser.

On or prior to the related Transfer Date, Seller shall, through its attorney, if requested by Purchaser and in cooperation with Purchaser's attorney, file appropriate pleadings with the court that will (i) substitute Purchaser's attorney for Seller's attorney, and (ii) remove Seller as a party to the litigation and substitute Purchaser as the real party in interest. If Seller fails to substitute Purchaser's attorney for Seller's attorney or to remove Seller as a party in interest, then Seller shall pay continued legal expenses in such litigation until such time as the substitution is effected. In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the substitution required pursuant to this Section 8(o). In no event shall Purchaser be liable for any contingency arrangements of Seller with Seller's attorneys.

(p)     _Notice to Attorneys._  Mail to each of Seller's bankruptcy attorney, Seller's foreclosure attorney, the mortgagor's attorney and the bankruptcy trustee a letter advising such attorney that Seller has sold the Mortgage Loan on the related Closing Date to Purchaser. Seller shall provide Purchaser with copies of such letters no later than the related Transfer Date.

(q)     _Mortgage Loans in Bankruptcy._  In accordance with Bankruptcy Rule 3001(e), Seller shall take all actions necessary to file, on or prior to the related Transfer Date, (i) proofs of claims in pending bankruptcy cases involving any Mortgage Loans for which Seller has not already filed a proof of claim, and (ii) evidence of the terms of the purchase of the Mortgage Loans with the appropriate bankruptcy court in cases in which Seller has filed proofs of claims. Seller shall prepare and provide to Purchaser on the related Transfer Date, an Affidavit and Assignment of Claim substantially in the form attached hereto as __Exhibit E__ (modified as appropriate to comply with applicable recording statutes) for all Mortgage Loans that are in bankruptcy as of the related Transfer Date. In addition, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, Seller's failure to effect the actions required pursuant to this Section 8(q).

SECTION 9. _Hazard Insurance._  If any Mortgaged Property is damaged on or after the related Cut-off Date as a result of fire, windstorm, flood, earthquake, natural disaster or other hazard, the proceeds of any such insurance policy relating to the related Mortgaged Property

-23-

shall be paid to Purchaser and/or the related mortgagor to be applied as required by the Mortgage Note, Mortgage or other loan documents.

SECTION 10. No Solicitation. From and after the related Cut-off Date, Seller hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on Seller's behalf, to personally, by telephone or mail, solicit the borrower or obligor under any Mortgage Loan for the purpose of refinancing, in whole or in part. It is understood and agreed that all rights and benefits relating to the solicitation of any mortgagors and the attendant rights, title and interest in and to the list of such mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to Purchaser pursuant hereto on the related Closing Date and Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by Seller or any affiliate of Seller which are directed to the general public at large, including, without limitation, mass mailings based on commercially acquired mailing lists, and newspaper, radio and television advertisements shall not constitute solicitation under this Section 10.

SECTION 11. Confidentiality. Seller and Purchaser each hereby agrees to fully comply with all applicable laws, rules and regulations governing the confidentiality of any information acquired from or concerning the mortgagors.

SECTION 12. Survival of Agreement. This Agreement includes provisions which the parties hereto intend will remain in effect after the closing of the transaction contemplated by this Agreement and the related Term Sheet. Accordingly, this Agreement and the related Term Sheet shall survive and remain in effect after the closing.

SECTION 13. Notices. All demands, notices and communications under this Agreement and the related Term Sheet shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate party hereto at the address stated in the introduction to this Agreement or (ii) transmitted by facsimile transmission or by electronic mail with acknowledgment, to the appropriate party hereto at the facsimile number or the electronic mail address provided by the other party to this Agreement. Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt).

SECTION 14. Severability Clause. Any part, provision, representation or warranty of this Agreement and the related Term Sheet which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

SECTION 15. Counterparts. For the purpose of facilitating the execution of this Agreement, and for other purposes, this Agreement and the related Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

SECTION 16. Place of Delivery and Governing Law. This Agreement and the related Term Sheet shall be deemed to have been made in the State of New York. This Agreement and the related Term Sheet shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues. The parties hereby agree that all disputes arising hereunder and in the related Term Sheet shall be submitted to and hereby subject themselves to the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

SECTION 17. Further Assurances. Each party to this Agreement agrees to execute and deliver such instruments and take such actions as the other party may, from time to time, reasonably request to effect the purpose and carry out the terms of this Agreement.

SECTION 18. Successors and Assigns; Assignment. This Agreement and the related Term Sheet shall bind and inure to the benefit of and be enforceable by Seller and Purchaser and the respective successors and assigns of Seller and Purchaser. Purchaser may assign this Agreement and the related Term Sheet to any person to whom any Mortgage Loan is transferred whether pursuant to a sale or financing and to any person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred. Upon any such assignment, the person to whom such assignment is made shall succeed to all rights and obligations of Purchaser under this Agreement and the related Term Sheet to the extent of the related Mortgage Loan or Mortgage Loans and this Agreement and the related Term Sheet, to the extent of the related Mortgage Loan or Loans, shall be deemed to be a separate and distinct agreement between Seller and such purchaser, and a separate and distinct agreement between Seller and each other purchaser to the extent of the other related Mortgage Loan or Loans. In the event that this Agreement and the related Term Sheet is assigned to any person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred, the rights and benefits under this Agreement which inure to Purchaser shall inure to the benefit of both the person to whom such Mortgage Loan is transferred and the person to whom the servicing or master servicing of the Mortgage Loan has been transferred; provided that, the right to require a Mortgage Loan to be repurchased by Seller pursuant to Subsection 5(e) shall be retained solely by Purchaser. This Agreement and the related Term Sheet shall not be assigned, pledged or hypothecated by Seller to a third party without the consent of Purchaser.

SECTION 19. Indemnification. Seller agrees to indemnify Purchaser and each of its officers, directors, employees, agents and subcontractors and to hold each of them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that are related to or arise from a breach of any representation and warranty or covenant under this Agreement and the related Term Sheet of Seller, and any action of any originator, holder or servicer of the Mortgage Loans occurring prior to the related Transfer Date.

-25-

SECTION 20.  Amendments.  Neither this Agreement nor any Term Sheet, nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a written instrument signed by both Seller and Purchaser.

SECTION 21.  Interpretation.  For all purposes of this Agreement and the related Term Sheet, initially capitalized terms used herein have the meanings ascribed hereto in this Agreement.  Except as expressly otherwise provided herein or unless the context otherwise requires, for purposes of this Agreement the words "herein," "hereto," "hereof" and "hereunder" and other words of similar effect shall refer to this Agreement as a whole and not to any particular provisions.

SECTION 22.  Intention of the Parties.  It is the intention of the parties that Purchaser is purchasing, and Seller is selling the related Mortgage Loans and not a debt instrument of Seller or any other security.  Accordingly, each party intends to treat each transaction for federal income tax purposes and each transaction shall be reflected on Seller's books and records, tax returns, balance sheet and other financial statements as a sale by Seller, and a purchase by Purchaser, of the related Mortgage Loans.

SECTION 23.  Reproduction of Documents.  This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 24.  Exhibits.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

SECTION 25.  Bid Letter.  The terms and conditions set forth in the bid letter between Purchaser and Seller (the "Bid Letter") with respect to each Closing Date shall be incorporated herein.  In the event of any conflict between the terms of this Agreement and the related Bid Letter, this Agreement shall control.

[TPW: NYLEGAL:216752.3] 17949-00392  05/28/2004 12:92 PM

IN WITNESS WHEREOF, Seller and Purchaser have caused their names to be signed hereto by their respective authorized officers as of the date first above written.

ALLSTATE HOME LOANS, INC.

By: _____
Name:
Title:

CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC

By: _____
Name:
Title:

EXHIBIT A-1

CONTENTS OF MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items:

1.  The original Mortgage Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____, without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature, including any riders thereto. In the event that the Mortgage Loan was acquired by Seller in a merger, the signature must be in the following form: "[Seller, successor by merger to name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by Seller while doing business under another name, the signature must be in the following form: "[Seller], formerly known as [previous name]" or in lieu thereof, a lost note affidavit with indemnification with a copy of the lost Mortgage Note attached thereto, in a form acceptable to Purchaser.

2.  If Seller chooses to use facsimile signatures to endorse Mortgage Notes, Seller must provide in an officer's certificate that the endorsement is valid and enforceable in the jurisdiction(s) in which the Mortgaged Properties are located and must retain in its corporate records the following specific documentation authorizing the use of facsimile signatures: (i) a resolution from its board of directors authorizing specific officers to use facsimile signatures; stating that facsimile signatures will be a valid and binding act on Seller's part; and authorizing Seller's corporate secretary to certify the validity of the resolution, the names of the officers authorized to execute documents by using facsimile signatures, and the authenticity of specimen forms of facsimile signatures; (ii) the corporate secretary's certification of the authenticity and validity of the board of directors' resolution; and (iii) a notarized "certification of facsimile signature," which includes both the facsimile and the original signatures of the signing officer(s) and each officer's certification that the facsimile is a true and correct copy of his or her original signature.

3.  Except as provided herein and for each Mortgage Loan that is not a MERS Loan, either: (i) the original recorded Mortgage, including all riders thereto, with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact; (ii) a certified true copy of the Mortgage, including all riders thereto, and of the power-of-attorney (if applicable) the originals of which have been transmitted for recording, until such time as the originals are returned by the public recording office, and in the case of each MERS Loan, the original Mortgage, noting the presence of the Mortgage Identification Number for any MERS Loan (the "MIN") and either language indicating that the Mortgage Loan is a Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Loan and its successors and assigns (a "MOM Loan") or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording thereon, or (iii) a copy of the Mortgage, including all riders thereto, certified by the public recording office in those instances where the public recording office retains the

A1/1

original or the original is lost, together with a duplicate original mortgagee's certificate of title.

4.  In the case of each Mortgage Loan that is not a MERS Loan, the original individual assignment of Mortgage for each Mortgage Loan, in blank, in form and substance acceptable for recording but not recorded; provided, however, that certain recording information will not be available if, as of the Closing Date, Seller has not received the related recorded Mortgage from the recorder's office. In the event that the Mortgage Loan was acquired by Seller in a merger, the assignment must be by "[Seller], successor by merger, to [name of predecessor]"; and in the event the Mortgage Loan was acquired or originated by Seller while doing business under another name, the assignment must be by "Seller, formerly known as [previous name]."

5.  Original or copy of the policy of title insurance (or, if such policy has not yet been issued by the insurer, the preliminary title report).

6.  Originals of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

7.  Originals or certified copies of all assumption, modification, consolidation or extension agreements, if any.

8.  Any security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

[TW: NYLEGAL:336752.1] 17999-00202  05/20/2004 12:02 PM

## EXHIBIT A-2

## CONTENTS OF SERVICING FILE

With respect to each Mortgage Loan, the Servicing File shall include each of the following items:

1.    A copy of each item in the Mortgage File.

2.    All necessary prepayment penalty documentation required to determine the amount of the prepayment penalty to be collected.

3.    The original hazard insurance policy and, if required by law, flood insurance policy.

4.    All required disclosure statements.

5.    Amortization schedule.

6.    Residential loan application.

7.    Mortgage Loan closing statement.

8.    Verification of employment and income, except for Mortgage Loans originated under a Limited Documentation Program.

9.    Verification of acceptable evidence of source and amount of downpayment, except for Mortgage Loans originated under a Limited Documentation Program.

10.    Credit report on the mortgagor.

11.    Residential appraisal report.

12.    Photograph of the Mortgaged Property.

13.    Survey of the Mortgaged Property (if any).

14.    Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

15.    If available, termite report, structural engineer's report, water potability and septic certification.

16.    Sales contract, if applicable.

17.    The original or copy of the policy of primary mortgage guaranty insurance or, where such insurance is provided by a master policy, a copy of such master policy together with the original certificate of insurance or a facsimile copy thereof, if any.

[TPW: NYLEGAL:236732.3] 17999-00002 05/28/2004 12:02 PM

18.    Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

EXHIBIT B

FORM OF TERM SHEET

This TERM SHEET (the "Term Sheet") dated _____, 200__ between Allstate Home Loans, Inc., a California corporation located at 5 Corporate Park, Suite 100, Irvine, California 92606-5117 (the "Seller") and Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company, located at 335 Madison Avenue – 19th Floor, New York, New York 10017 (the "Purchaser") is made pursuant to the terms and conditions of that certain Master Mortgage Loan Purchase Agreement (the "Agreement") dated as of May 1, 2004, between the Seller and the Purchaser, the provisions of which are incorporated herein as if set forth in full herein, as such terms and conditions may be modified or supplemented hereby. Capitalized terms used in this Term Sheet and not otherwise defined herein shall have the meanings specified in the Agreement.

Definitions

For purposes of the Mortgage Loans identified on Schedule One hereto to be sold pursuant to the Agreement, the following terms shall have the following meanings:

Closing Date:  _____, 200__, or such other date as the parties may agree.

Cut-off Date:  _____, 200__

Principal Balance:   $_____

Transfer Date:  _____, 200__

Purchase Price:        With respect to each Mortgage Loan, the amount specified on Schedule Two hereto.

[Additional Terms and Conditions

The Mortgage Loans identified on Schedule Four hereto do not have tax service contracts.

On the Closing Date, the Purchaser has purchased certain mortgage loans with document deficiencies (the "Affected Mortgage Loans") as listed on Schedule Three-A and Schedule Three-B attached hereto. In consideration of the Purchaser's agreement to purchase the Affected Mortgage Loans, the Purchaser and the Seller hereby agree as follows:

1.     The Seller shall deliver to the Purchaser or its designee, Litton Loan Servicing LP, 4828 Loop Central Drive, Houston, Texas 77081, Attention: Lela Derouen, within (a) 60 days from the Closing Date with respect to any Mortgage Loan originated more than 6 months prior to the Closing Date (the "Seasoned Loan Cure Date") all necessary documentation to cure the document deficiencies as outlined on Schedule Three-A and (b) 120 days from the Closing Date with respect to any Mortgage Loan originated within 6 months of the Closing Date (the "Newly Originated Loan Cure Date", together with the Seasoned Loan Cure Date, the "Cure Date") all necessary documentation to cure the document

deficiencies as outlined on Schedule Three-B. In the event that the Seller fails to deliver all necessary documentation to cure the deficiency with respect to any Affected Mortgage Loan by the applicable Cure Date, the Seller will repurchase such Affected Mortgage Loan at the Repurchase Price specified in the Agreement. The repurchase will occur no later than one (1) business day from the applicable Cure Date.

2.  Contemporaneously with any repurchase of an Affected Mortgage Loan, the Purchaser will reconvey such Mortgage Loan to the Seller by delivering to the Seller or the Seller's designee the collateral documents delivered to the Purchaser with proper assignment and endorsement documentation.

3.  The rights granted hereunder shall be cumulative with the rights provided under the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns. This Term Sheet shall survive the closing of the transaction and shall not be merged with the Agreement or any other agreement, and shall be independently enforceable by the parties hereto. For the purpose of facilitating the execution of this Term Sheet, and for other purposes, this Term Sheet may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.]

B-2

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed to this Term Sheet by their respective duly authorized officers as of the date first above written.

ALLSTATE HOME LOANS, INC.

By: _____
Name:
Title:

CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC

By: _____
Name:
Title:

SCHEDULE ONE

MORTGAGE LOAN SCHEDULE

1.      Loan #

2.      Originator Name

3.      Borrower Name Property Address (including Zip Code)

4.      UPB as of Cut-Off Date

5.      Mortgage Note Date

6.      Paid to Date

7.      Lien Priority (First or Second)

8.      PMI Coverage and name of Insurer

9.      Origination, Appraisal, Value

10.     Seller's BPO Value, if any

11.     LTV at Origination

12.     Combined LTV at Origination (for second liens)

13.     Original Note Rate

14.     Current Note Rate

15.     Original P&I

16.     Current P&I

17.     12 month Cash Collection

18.     Original Maturity Date

19.     Type of Plan (Bankruptcy, Foreclosure, etc.)

20.     Modification Date

21.     Foreclosure Flag

22.     Bankruptcy Flag

[TFW: NYLEGAL:236752.3] 17999-00302  05/28/2006 12:02 PM

23. Plan Maturity Date

24. Fixed or Adjustable Interest Rate

25. Index

26. Next Adjustment Date

27. Margin

28. Original Term

29. Current Term (if Modified)

30. Periodic or Lifetime Caps or Floors

31. Property Type

32. Arrearage

33. Accrued Interest

34. Escrow Advances

35. Claimable Corporate Advances

36. Prepayment Penalty Percentage

37. Prepayment Penalty Term

38. Section 32 Disclosure

39. Purpose (Purchase Finance, Rate (Term Refinancing, Cash-Out Refinancing, etc.)

40. Documentation Style (Full, Alternative, Reduced, etc.)

41. Owner Occupied, Investment, etc.

42. Ground Leases (Y/N)

43. Balloon Loans (Y/N)

{RPW: NYLEGAL:2267523} 17999-00102  05/28/2004 12:02 PM

SCHEDULE TWO

PURCHASE PRICE SCHEDULE

[SCHEDULE THREE-A

DOCUMENT DEFICIENCY SCHEDULE]

[SCHEDULE THREE-B

DOCUMENT DEFICIENCY SCHEDULE]

[SCHEDULE FOUR

MORTGAGE LOANS WITHOUT TAX SERVICE CONTRACTS]

EXHIBIT C

FORM OF SECURITY RELEASE CERTIFICATION

I. Release of Security Interest

_____ ("Lender"), hereby relinquishes any and all right, title and interest it may have in and to the Mortgage Loans described in Schedule One attached hereto upon purchase thereof by Credit-Based Asset Servicing and Securitization LLC from the Seller named below pursuant to that certain Master Mortgage Loan Purchase Agreement, dated as of May 1, 2004, as of the date and time of receipt by Lender of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, deeds, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Seller named below or its designees as of the Date and Time of Sale.

Name and Address of Lender

_____
(Name)

_____
(Address)

By:

C-1

## II. Certification of Release

The Seller named below hereby certifies to Credit-Based Asset Servicing and Securitization LLC that, as of the Date and Time of Sale of the above mentioned Mortgage Loans, to Credit-Based Asset Servicing and Securitization LLC, the security interests in the Mortgage Loans released by the above named [corporation] comprise all security interests relating to or affecting any and all such Mortgage Loans. The Seller warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

ALLSTATE HOME LOANS, INC.
Seller

By: _____
Name: _____
Title: _____

EXHIBIT D

FORM OF BILL OF SALE

Allstate Home Loans, Inc. hereby absolutely sells, transfers, assigns, sets-over and conveys to Credit-Based Asset Servicing and Securitization LLC, a limited liability company organized under the laws of the State of Delaware, without recourse:

(a) All right, title and interest in and to each of the assets identified in the Schedule attached hereto as <u>Schedule One</u> including the servicing rights appurtenant thereto; and

(b) All principal, interest or other proceeds of any kind received after the close of business on _____ 200__ with respect to such assets, including but not limited to insurance proceeds, condemnation awards and other proceeds derived from the conversion, voluntary or involuntary, of any of such assets into cash or other liquidated property.

The ownership of each Mortgage Note, Mortgage and the contents of the Mortgage File is vested in Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of Seller shall immediately vest in Purchaser and shall be retained and maintained, in trust, by Seller at the will of Purchaser in such custodial capacity only. The sale of each Mortgage Loan shall be reflected as a sale on Seller's business records, tax returns and financial statements.

This Bill of Sale is made pursuant to, and is subject to the terms and conditions of, that certain Master Mortgage Loan Purchase Agreement dated as of May 1, 2004 between Allstate Home Loans, Inc., as Seller, and Credit-Based Asset Servicing and Securitization LLC, as Purchaser (the "Agreement"). Seller confirms to Purchaser that the representations and warranties set forth in Section 5 of the Agreement are true and correct as of the date hereof.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

DATED: _____

ALLSTATE HOME LOANS, INC.

By: _____
Name:
Title:

D-1

{TY:W: NYLEGAL:236752.3} {7999-00502  05/28/2004 12:02 PM}

EXHIBIT E

FORM OF AFFIDAVIT AND ASSIGNMENT OF CLAIM

State of _____

County of _____

The undersigned, being first duly sworn, deposes and states as follows:

_____ ("Assignor"), acting by and through its duly authorized representatives, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to _____, a _____ ("Assignee"), its successors and assigns, all of the Assignor's interest in any claim in the bankruptcy case commenced by or against _____ ("Debtor") in the matter of _____ (U.S. Bankruptcy Court, _____, Case No. _____) ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of _____ dated _____ and payable to _____.

For purposes of Bankruptcy Rule 3001, this affidavit and assignment represents the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described in the preceding paragraph; and shall constitute the Assignor's acknowledgment of the transfer and statement of the consideration therefor, as required by said Rule 3001.

The consideration of the transfer was cash. No specific amount of the total consideration was assigned to the debt which forms the basis of the Bankruptcy Claim. This affidavit and assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the Bankruptcy Claim.

E-1

IN WITNESS WHEREOF, the Assignor has caused this document to be executed at _____ on _____

ALLSTATE HOME LOANS, INC.

By: _____
Name:
Title:

STATE OF _____ )
                          )
COUNTY OF _____ )

On _____, before me the undersigned Notary Public, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as _____ of _____ and acknowledged to me that the said corporation executed it.

WITNESS my hand and official seal.

Dated: _____               _____
                                     Notary Public

B-2

EXHIBIT F

FORM OF BAILEE LETTER AGREEMENT

_____, 200__

Reginald L. Carter
The Bank of New York
700 South Flower Street, Suite 200
Los Angeles, California 90017
Phone: (213) 630-6426
Fax:    (213) 955-2493
E-mail: recarter@bankofny.com

Re:    Sale of certain mortgage loans from Allstate Home Loans, Inc. (the "Seller") to Credit-
       Based Asset Servicing and Securitization LLC (the "Purchaser") pursuant to that certain
       Master Mortgage Loan Purchase Agreement, dated as of May 1, 2004, between the Seller
       and the Purchaser (the "Agreement").

Ladies and Gentlemen:

        In connection with the above-referenced transaction, and in consideration of the mutual
promises set forth herein, the Seller and The Bank of New York (the "Bailee") hereby agree to
the terms of this bailee letter (the "Bailee Agreement") as follows:

1.      On such dates agreed upon by the Purchaser and the Seller (each, a "Delivery Date"), the
        Seller shall deliver to the Bailee, as Bailee for the Seller, an asset file (each, an "Asset
        File") for certain mortgage loans identified on a schedule to be attached hereto as
        Schedule 1 with respect to each Delivery Date.  Each such Asset File shall contain the
        items set forth on Exhibit I attached hereto.

2.      On each Delivery Date the Bailee shall issue in the name of the Seller, an initial trust
        receipt by facsimile evidencing the Seller's ownership of the related Asset Files in the
        form of Annex A hereto (the "Initial Trust Receipt"), which shall state that the Bailee
        has received an Asset File for each of the assets listed on the schedule attached to the
        related Initial Trust Receipt.

3.      On each Closing Date, if the Seller has met the conditions precedent set forth in the
        Agreement, the Purchaser shall disburse funds to the Seller pursuant to the related Term
        Sheet for such Closing Date.  Such funds should be distributed to [the Seller] [the Seller's
        warehouse lender] by wire transfer of immediately available funds in accordance with the
        instructions specified below:

Wire Transfer Instructions

F-1

[TPW: NYLEGAL:2367523] 17999-00202 05/26/2004 12:02 PM

[Name of Bank]
ABA [_____]
Acct No. [_____]
FCT: [_____]
Attn: [_____]
Ref: [_____]

4. Upon receipt of written confirmation from the Purchaser that the Purchaser has paid the purchase price as set forth in the above paragraph, the related Asset Files shall be released to the Bailee for the benefit of the Purchaser, and the Bailee shall thereafter be bailee and custodian for the sole benefit of the Purchaser with respect to the related Asset Files. Upon the Bailee's receipt of such written confirmation each Initial Trust Receipt with respect to the related Asset Files thereafter shall automatically be canceled and shall be marked "Canceled" by the Seller and shall be promptly returned to the Bailee.

5. From the related Delivery Date until the related Closing Date and after a related Return Date (as defined in paragraph 6 below), if any, the Bailee shall maintain continuous custody and control of the related Asset Files as the sole and exclusive Bailee for the Seller.

6. Upon payment of the purchase price, the Seller hereby releases all security interests, rights, liens or claims of any kind it may have with respect to the related Mortgage Loans.

7. In the event that the Bailee is notified by the Purchaser in writing that certain of the mortgage loans will not be purchased by the Purchaser, the Bailee shall return the affected Asset Files to the Seller at the Seller's expense within one (1) business day thereof (the "Return Date") in accordance with the Seller's instructions.

8. The Seller authorizes the Bailee to make the Asset Files available for review to Credit-Based Asset Servicing and Securitization LLC or representatives thereof.

9. The agreement set forth in this Bailee Agreement may not be modified, amended or altered, except by written instrument, executed by all of the parties hereto.

10. For the purpose of facilitating the execution of this Bailee Agreement as herein provided and for other purposes, this Bailee Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute and be one and the same instrument.

11. This Bailee Agreement shall be construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, except to the extent preempted by federal law.

12. This Bailee Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Bailee and their respective permitted successors and assigns. The terms "Seller", "Bailee" and "Purchaser" herein shall be deemed to include any such permitted

E-2

successors and assigns thereof. No party to this Bailee Agreement may assign any or all of its rights and obligations hereunder without the consent of the other party.

13. Capitalized terms used herein and not otherwise defined shall have the meanings assigned in the Agreement.

14. This Bailee Agreement shall supersede any previous bailee agreements executed with respect to the attached assets.

Very truly yours,

ALLSTATE HOME LOANS, INC.,
as Seller

By: _____

Name:
Title:

ACCEPTED AND AGREED:

THE BANK OF NEW YORK,
as Bailee

By: _____
Name: _____
Title: _____

F-3

EXHIBIT 1

CONTENTS OF ASSET FILE

1. The original Mortgage Note, bearing all intervening endorsements, endorsed, "Pay to the order of _____ without recourse" and signed in the name of Seller by an authorized officer or by facsimile signature. In the event that the Mortgage Loan was acquired by Seller in a merger, the signature must be in the following form: "[Seller, successor by merger to name of predecessor]"; and in the event that the Mortgage Loan was acquired or originated by Seller while doing business under another name, the signature must be in the following form: "[Seller], formerly known as [previous name]" or in lieu thereof, a lost note affidavit with indemnification with a copy of the lost Mortgage Note attached thereto, in a form acceptable to Purchaser.

2. Except as provided below and for each Mortgage Loan that is not a MERS Loan, either: (i) the original recorded Mortgage with recording information thereon, together with a certified true copy of the original power-of-attorney showing the recording information thereon if the Mortgage was executed by an attorney-in-fact; (ii) a certified true copy of the Mortgage and of the power-of-attorney (if applicable) the originals of which have been transmitted for recording, until such time as the originals are returned by the public recording office and in the case of each MERS Loan, the original Mortgage, noting the presence of the MIN of the Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon; or (iii) a copy of the Mortgage certified by the public recording office in those instances where the public recording office retains the original or the original is lost.

3. In the case of each Mortgage Loan that is not a MERS Loan, the original individual assignment of Mortgage for each Mortgage Loan, in blank, in form and substance acceptable for recording but not recorded; provided, however, that certain recording information will not be available if, as of the Closing Date, Seller has not received the related recorded Mortgage from the recorder's office. In the event that the Mortgage Loan was acquired by Seller in a merger, the assignment must be by "[Seller], successor by merger, to [name of predecessor]"; and in the event the Mortgage Loan was acquired or originated by Seller while doing business under another name, the assignment must be by "Seller, formerly known as [previous name]."

4. Original or copy of the policy of title insurance (or, if such policy has not yet been issued by the insurer, the preliminary title report).

5. Originals of all intervening assignments, if any, with evidence of recording thereon, or certified true copies with evidence that the originals have been transmitted for recording until such time as the originals are returned by the public recording office, or a copy of each such assignment certified by the public recording office if such office retains the original, or if such original is lost.

6.    Originals or certified copies of all assumption, modification, consolidation or extension agreements, if any.

ANNEX A

INITIAL TRUST RECEIPT

[Date]

[Seller]
[Address]
Attention: _____

Re:  Bailee Agreement dated _____ ___, 200__ (the "Bailee Agreement")
between Allstate Home Loans, Inc. (the "Seller") and The Bank of New York (the
"Bailee")

Ladies and Gentlemen:

In accordance with the provisions of Paragraph 2 of the above-referenced Bailee
Agreement, the undersigned, as the Bailee, hereby confirms that as to each asset described in the
schedule attached hereto as Schedule 1, it has determined that it has received an Asset File.

The Bailee hereby confirms that it is holding each Asset File as agent and Bailee for the
exclusive use and benefit of the Seller pursuant to the terms of the Bailee Agreement.

This Initial Trust Receipt is not negotiable except by the Seller (or its successor and
assigns).

All initially capitalized terms used herein shall have the meanings ascribed to them in the
above-referenced Bailee Agreement.

THE BANK OF NEW YORK

By: _____
Name:
Title:

F-6

SCHEDULE I

MORTGAGE LOAN SCHEDULE

[TPW: NYLEGAL:230752.3] 17969-00102  05/23/2006 12:02 PM

EXHIBIT G

SERVICING TRANSFER INSTRUCTIONS

| | | | |
|---|---|---|---|
| Date: | [Initial Closing Date] | Subject: | Allstate Home Loans, Inc. |
| To: | [Seller's Servicer contract] | From: | Donna Davis |

This memo confirms the following list of items required to complete the servicing transfer on each transfer date pursuant to the Master Mortgage Loan Purchase Agreement, dated as of May 1, 2004, between Credit-Based Asset Servicing and Securitization LLC and Allstate Home Loans, Inc.

I.    CONVERSION DATA

Conversion data can be supplied in 3 formats:

    A.    Manual conversion

        1.    Provide a "master file data record" for each loan (accompanied by a listing of all your code definitions).

        2.    Provide a trial balance containing all the loans.  Provide for both preliminary and final data.

        3.    Preliminary data should be provided within 24 hours after each closing date.

        4.    Final data should be provided within 24 hours after each servicing transfer date.

    B.    Electronic conversion

        1.    If it is determined that this type of conversion is advantageous to both parties the format (Microsoft Excel) will be furnished.

        2.    Preliminary data should be provided within 24 hours after each closing date.

        3.    Final data should be provided within 24 hours after servicing transfer date.

        4.    A trial balance must be provided for both preliminary and final.

    C.    Tape to Tape conversion

        1.    If it is determined that this type of conversion is advantageous to both parties the details will be furnished.

        2.    Preliminary tape should be provided within 24 hours after each closing date.

        3.    Final data tape should be provided within 24 hours after transfer date.

        4.    A trial balance must be provided for both preliminary and final.

II.    HOMEOWNER NOTIFICATION

A.   The mortgagor notification (good-bye letter) must be mailed at least 15 days prior to the transfer date. A copy of your good-bye letter must be faxed to Donna Davis (fax number 713-561-8248) for approval prior to mailing.

B.   Electronic file or hard copies of your mortgagor notification letters should be provided to LLS within 5 days after servicing transfer date.

C.   INFORMATION FOR NOTIFICATION LETTERS

Hours of operation:                          7:00 am to 7:00 pm (CST)
Customer Service Toll Free Number:           (800) 247-9727
Correspondence Address:                      Litton Loan Servicing, LP
                                             4828 Loop Central Drive
                                             Houston, Texas 77081
Payment Address:                             Litton Loan Servicing, LP
                                             P.O. Box 4387
                                             Houston, Texas 77210-4387

III.   HAZARD / FLOOD INSURANCE

A.   The Hazard / Flood insurance policies should be in separate files identified with your loan number.

B.   Please request a change to the mortgagee clause as follows:

         Litton Loan Servicing LP
         Its Successors or Assigns
         P.O. Box 4354
         Houston, TX  77210-4354

C.   Copies of the mortgagee clause change requests should be provided to LLS.

D.   Any unpaid policies, expiration notices, cancellation notices, loans with expired policies should be properly identified, sorted and marked for special handling.

E.   Individual loan insurance records showing payee (name and address), due dates, frequency of payment, next due date, last paid date and last paid amount should be provided in electronic format.

F.   Provide a list of loans under your "force place coverage" program. Will the coverage on individual loans remain in effect until expiration or be canceled at time of the transfer?

G.   Insurance loss drafts should provide all documentation on the current status.

IV.    FHA LOANS

    A.    Provide a listing including the following items on FHA Loans with a monthly premium.

        1.    Loan number
        2.    FHA case number
        3.    Anniversary date
        4.    Annual premium
        5.    Monthly amount
        6.    Total MIP paid to date
        7.    Next month the premium is due

    B.    Provide a listing including the following items on FHA loans that the full premium was paid up front.

        1.    Loan number
        2.    FHA case number
        3.    Insuring date
        4.    Amount of prepaid premium

    C.    Provide a listing of all FHA Uninsured loans.

    D.    Provide a listing of all FHA 235 loans.

    E.    Provide your HUD ID#.

    F.    HUD Form 92080 should be completed with our HUD mortgagee number (72313) and mailed to LLS for signing and forwarding to HUD. Remember, HUD requires notification by tape if more than 15 loans are transferring.

V.    CONVENTIONAL LOANS

    A.    Provide the individual loan PMI certificates

    B.    Provide copies of the notification to the PMI companies requesting a change of servicer to LLS.

    C.    Listing of all loans with PMI to include:

        1.    Loan number
        2.    PMI company
        3.    PMI certificate number
        4.    Next due date
        5.    Last amount paid
        6.    Percentage of Coverage

[TPW: NYLEGAL:236752.3] 17999-00102  03/26/2004 12:02 PM

D.  Homeowner Protection Act of 1998.

    1.  Loans originated after July 29, 1999: Provide copies of original disclosure notice produced at origination of loan.

    2.  Loans originated prior to July 29, 1999: Provide the annual disclosure notices supplied to borrowers.

E.  Listing of loans that have Pool Insurance. If loan has Pool Insurance supply name, address and phone number of insurance agency.

F.  Listing of loans that have Pool Insurance and private mortgage insurance.

VI.  REAL ESTATE TAXES

A.  Individual loan tax records showing payee (name and address), due dates, frequency of payment, next due date, last paid date and last paid amount along with tax contract numbers and vendor information should be provided in electronic format.

B.  Provide copies of any tax service contracts along with the request for a change of servicer to LLS under the following vendor numbers (Transamerica-2489, First American-56353, Lereta-65000, Fidelity-2059). We also have tax contracts with other tax services, which you can contact us for more information.

C.  All property taxes due and payable should be paid prior to the transfer date.

D.  Provide a listing of any loans with delinquent taxes containing the pertinent information as of the transfer date.

VII.  OPTIONAL INSURANCE

A.  Only prepaid optional insurance should be provided to LLS.

B.  All prepaid optional insurance should include the following information.

    1.  Loan number
    2.  Insurance company
    3.  Type of coverage
    4.  Policy Number
    5.  Coverage Amount
    6.  Policy Effective Date
    7.  Premium Amount
    8.  Expiration Date

C.  Copies of the master and/or individual policies for the insurance coverage.

D.  Copies of the notification sent to the insurance companies.

G-11

VIII.  INVESTOR REPORTS

    A.  Copy of the final remittance report to the investor including a trial balance as of cut-off date.

    B.  Provide a list of all simple interest loans.

    C.  Provide a list of all loans currently on ACH Draft. The borrower to be notified that their ACH Draft will be discontinued in your good bye letter.

IX.  CORPORATE ADVANCES

    A.  Provide list of all loans with corporate advances.

    B.  Back-up documentation must be supplied for any loan with a corporate advance. The documentation must balance to the advance amount.

    C.  Back-up documentation must be received at the time of transfer.

X.  MERS DATA

    A.  All MERS loans must be moved to correct ORG ID to coincide with transfer.

    B.  The batch number must be supplied to Litton.

    C.  The MIN number must be supplied for each loan transferred on MERS.

XI.  PAYOFFS

    A.  Provide a list of loans that have prepayment penalty provisions in the mortgage.

    B.  Loan level prepayment penalty information must be provided on any loan with a prepayment penalty. This information should be provided in an electronic file or hard copy.

    C.  Unprocessed payoff funds should be accompanied by a copy of the payoff quotation.

    D.  Information should be furnished on any pending payoff or assumption.

    E.  Information on any incomplete partial release should be provided.

XII.  ADJUSTABLE RATE MORTGAGES / GPM / BUYDOWNS / BALLOONS

    A.  Provide individual loan historical rate and P&I changes.

    B.  ARM provisions for each loan within the portfolio

    C.  Provide list of ARM Plans and definitions.

G-12

D.    Provide a list of loans that are step rate and/or GPM mortgages with status of account.

E.    Provide a list of loans that are buydowns with status of account.

F.    Provide a list of balloon loans, their maturity dates, amortization term and if they have a convertible option.  If a loan has reached its maturity date prior to conversion furnish the current status.

G.    Provide a list of loans that are Servicemember's Civil Relief Act, as amended and copies of their orders.

XIII.  FORECLOSURES

A.    A list of contact people for the Foreclosure, Claims and Bankruptcy area needs to be provided to Litton.

B.    A listing of loans in foreclosure, sorted by state, including status report on each loan showing the current stages of the foreclosure, the foreclosure referral date and who is holding the original documents.  Alltel users please provide For1, For 2 and For3 screens or Foreclosure (Service Release report).   Preliminary report should be provided within 3 days after each closing date and a final report at the time of the transfer.

C.    Name and address listing of foreclosure attorneys/ Preliminary report should be provided within 3 days after each closing date.

D.    Listing of any loans pending a Refunding to the Va., HUD Assignment, approved Dil, Presale or Partial Claim/ Preliminary report should be provided within 3 days after each closing date and a final report at the time of the transfer.

E.    Listing of any loan currently in litigation and a report to be provided at time of transfer.

F.    Listing of loans with escrow advances due to delinquency, include breakdown with bills and ledgers attached and reconciled (90, 60, 30) / Report to be provided at time of transfer.

G.    Report of delinquent loans 90 days or older that are not active in foreclosure and or bankruptcy; list date of breach letter and provide copies of breach letter for our file.

H.    Vendor invoices to be paid up to the transfer date.

I.    Report of any loans on a stipulation or payment agreement and a copy of the agreement to be included in the file.

J.    The name of the beneficiary they are using for foreclosures.

G-13

K.      Files for foreclosures, bankruptcies, claims, breached loans, repayment plans and active loss mitigation accounts must be sorted and identified separately by marking the front of the file or boxing separately.

L.      Trailing correspondence should be sent weekly with the exception of checks or money orders which should be forwarded daily.

M.      Foreclosure files should be sent to the following address:

> Litton Loan Servicing LP
> ATTN: CARLETTA LOTT
> 4828 Loop Central Drive
> Houston, TX 77081

## XIV.  BANKRUPTCY

A.      Preliminary listing of loans active in bankruptcy, sorted by state, including the following information. (a) Type of Chapter filed (b) Date Bankruptcy filed (c) Case Number. Alltel users please provide BNK1 or Bankruptcy Service Release report. This report should be forwarded within 3 days after deal closing and a final provided on the transfer date.

B.      Listing showing names and address of the debtor's attorney, Seller's attorney and Bankruptcy Trustee. A preliminary report should be provided within 3 days after each closing date and a final provided on the date of the transfer.

C.      Listing of pending relief of stays.

D.      Loan level listing of all loans with agreed orders or stipulation agreements with the current status on each of the cases.

E.      Listing of loans with escrow advances due to bankruptcy. Include breakdown with bill and ledgers attached and reconciled (90, 60, 30 days).

F.      Copies of letters to bankruptcy attorney advising of the transfer.

G.      List of any cramdowns.

H.      Files should be sorted and clearly marked for special handling.

I.      Files should have the status shown on the front of each file and status screen prints included in each file.

J.      Provide a status report that includes attorney's name and phone number, chapter, case number, BK billing date, POC date, prepetition due date, post petition due date and motion status if filed as of the transfer date.

K.      Bankruptcy files should be sent to the following address:

{TBW: NYLEGAL:736752.3} 17997-00302 05/28/2004 12:02 PM

Litton Loan Servicing LP
ATTN: CARLETTA LOTT
4828 Loop Central Drive
Houston, TX 77981

XV.  LOSS MITIGATION

    A.  Short Sale

        1.  Recent Property Valuation
        2.  Sales Contract
        3.  HUD-1 Settlement Statement, estimated
        4.  Realtor/Broker contact information
        5.  Borrower financials
        6.  Borrower hardship letter
        7.  Approval letter (if approved and not closed prior to servicing transfer)

    B.  Modification: A preliminary report should be provided within 3 days after each
        closing date and the final at servicing transfer date.

        1.  Recent Property Valuation
        2.  Title Search
        3.  Modification Agreement or terms of Modification
        4.  Document/Title co. contact information
        5.  Borrower financials
        6.  Borrower hardship letter
        7.  Identification of any funds collected in conjunction with modification.

    C.  Deed-in-Lieu of Foreclosure

        1.  Recent Property Valuation
        2.  Title Search
        3.  D-I-L Agreement
        4.  Document/Title co. contact information
        5.  Borrower financials
        6.  Borrower hardship letter

    D.  Partial-Claims

        1.  Borrower financials
        2.  Borrower hardship letter
        3.  HUD Insurance Certificate
        4.  Identify prior partial claim filings if applicable

[TPW: NYLEGAL:236752.3] (7999-00102. 05/28/2004 12:02 PM

XVI.  OTHER

A.  Provide current year's loan history to the transfer date plus the four prior calendar year's loan histories accompanied by an explanation of your transaction codes. History should be provided in an electronic file or hard copy. A preliminary report should be forwarded within 3 days after each closing date and the final within 2 days after servicing transfer date.

B.  Provide copies of the last two-escrow analysis with an explanation of your analysis method (cushion, etc.).

C.  Provide the currently active collection records and pertinent information on delinquent loans along with FICO scores, BPO values, extension data and payment plan data. A preliminary report should be forwarded within 3 days after each closing date and the final at servicing transfer date. This information should be provided in an electronic file or hard copy.

D.  Your check for the escrow balances matching the cut-off trial balance.

E.  Your check for any unapplied funds and an indication as to how each unapplied payment should be applied.

F.  Listing of the first lien holder (containing company, address and loan number), if the loan being transferred is a second lien.

G.  Loan payments and/or payoff funds received after the cut-off should be endorsed to Litton Loan Servicing LP and forwarded by overnight service to the following address within twenty-four hours, properly identified with your loan number.

> Litton Loan Servicing LP
> ATTN: Cashiering Department
> 4828 Loop Central Drive
> Houston, TX  77081

H.  Please ship the entire loan file (hard, microfiche or imaged) and all documents to LLS to be received by the transfer date. Provide electronic inventory ledger with servicing files to identify loans within each box. Any information such as preliminary trial balances, master file data records, default information, previous year's ledger histories, etc. should be furnished as early as possible prior to the transfer date. Any file sent to LLS that we will not be servicing will be returned via uninsured regular mail unless LLS is supplied with shipping instructions and method of payment.

All servicing files should be sent to:

Litton Loan Servicing LP
Attn: Records Management Department
4828 Loop Central Drive
Houston, TX 77081

J.    All reports such as trial balances, master file data records, default information, histories, etc. should be sent to:

Litton Loan Servicing LP
Attn: Donna Davis
4828 Loop Central Drive
Houston, TX 77081

Remember it is your responsibility to furnish all required IRS reporting statements on these loans for the current year up to the transfer date both to the mortgagors and to the appropriate government agencies.

[TPW: NYLEGAL:236752.3] 17959-00202 05/28/2004 12:02 PM

Your cooperation in expediting this transfer is appreciated. Should you or any member of your staff have any questions concerning this transfer, please feel free to call me or the appropriate individual listed below at 1-800-247-9727.

| Contact | Department | Extension |
|---|---|---|
| Helen Sanders<br>hsanders@litton.c-bass.com | ARM's | 8967 |
| Lynn Lindsey<br>lynn.lindsey@litton.c-bass.com | ARM's | 8921 |
| Donna Davis<br>ddavis@litton.c-bass.com | Conversion Manager | 8936 |
| Carletta Lott<br>clott@litton.c-bass.com | Foreclosure/Bankruptcy | 8723 |
| Cheryl Fielder<br>cfielder@litton.c-bass.com | Insurance | 8868 |
| Yolanda Omeara<br>yomeara@litton.c-bass.com | Investor Accounting | 8929 |
| Debbie Thayer<br>Debbie.thayer@litton.c-bass.com | Payoffs | 8880 |
| Janice McClure<br>jmcclure@litton.c-bass.com | Senior Vice President | 8801 |
| Bob Tompkins<br>btompkin@litton.c-bass.com | Servicing Manager | 8959 |
| Kathy Nelson<br>knelson@litton.c-bass.com | Tax | 8881 |

[TTW: NYLEGAL:236752.3] 17899.00592 05/20/2004 17:02 PM

## EXHIBIT H

## FORM OF SELLER'S OFFICER'S CERTIFICATE

I, _____ hereby certify that I am the duly elected _____ of Allstate Home Loans, Inc., a California corporation (the "Seller"), and further certify, on behalf of the Seller as follows:

1.      Attached hereto as Attachment I is a true and correct copy of the Certificate of Incorporation and by-laws of the Seller as are in full force and effect on the date hereof.

2.      No proceedings looking toward merger, liquidation, dissolution or bankruptcy of the Seller are pending or contemplated.

3.      Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Master Mortgage Loan Purchase Agreement (the "Purchase Agreement"), dated as of _____ 1, 200__, between the Seller and Credit-Based Asset Servicing and Securitization LLC (the "Purchaser"); (b) the Term Sheet, dated _____ 200__ between the Seller and the Purchaser (the "Term Sheet"); and (c) any other document delivered prior hereto or on the date hereof in connection with the sale of the Mortgage Loans in accordance with the Purchase Agreement and the Term Sheet was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

4.      Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of the Seller on _____, 200__ or the standing resolutions of the Seller (the "Resolutions") with respect to the authorization and approval of the sale of the Mortgage Loans or the sale of mortgage loans generally; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

5.      Attached hereto as Attachment III is a Certificate of Good Standing of the Seller dated _____, 200__. No event has occurred since _____, 200__ which has affected the good standing of the Seller under the laws of the State of _____.

6.      All of the representations and warranties of the Seller contained in Section 5 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

7.      The Seller has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date pursuant to the Purchase Agreement and the related Term Sheet.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

H-1

Dated: _____

    [Seal]

           ALLSTATE HOME LOANS, INC.
           (Seller)

           By: _____
           Name:
           Title:    [Vice President]

I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting Vice President of the Seller and that the signature appearing above is genuine.

    IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____

    [Seal]

           ALLSTATE HOME LOANS, INC.
           (Seller)

           By: _____
           Name:
           Title:    [Assistant] Secretary

[TPW: NYLEGAL:2367523] 17359-00502  05/28/2004 12:02 PM

# EXHIBIT 2

EXHIBIT A

**EXHIBIT 3**



Scott Hendry
Senior Vice President and Deputy General Counsel
335 Madison Avenue
New York, New York 10017
(Tel) 212.850.5024/(Fax) 212.850.7762
scott.hendry@c-bass.com

April 19, 2007

Mr. Doug Lawrence
Shearson Home Loans
8 Hughes, Suite 250
Irvine, CA 92618

RE:   Master Mortgage Loan Purchase Agreement (the "Agreement") entered into as of
      May 1, 2004 by and between Allstate Home Loans, Inc., a California
      corporation having an office at 5 Corporate Park, Suite 100, Irvine, CA  92606-
      5117 ("Seller") and Credit-Based Asset Servicing and Securitization LLC, a
      Delaware limited liability company having an office at 335 Madison Avenue -
      19th Floor, New York, New York 10017 ("Purchaser") and the related Term
      Sheet Agreements (the "Term Sheet Agreements") dated June 3, 2004, November
      24, 2004, December 8, 2004, November 17, 2005, February 24, 2006, June 8,
      2006, October 11, 2006, and November 1, 2006, between Seller and  Purchaser.

Subject:  Outstanding Claims and Repurchases

Dear Mr. Lawrence,

I am writing regarding C-BASS's repeated requests for you to honor your contractual
obligations under the Master Mortgage Loan Purchase Agreement between Allstate
Home Loans, Inc. as Seller and C-BASS, as Purchaser dated as of May 1, 2004 (the
"MLPA") and the various Term Sheets listed above. The Term Sheets incorporate by
reference the terms of the MLPA. It is our understanding that Allstate Home Loans Inc.
was purchased by Shearson Financial Network Inc. in July 2006 and that Seller and

Shearson Home Loans are the same entity (See the attached Secretary of State Corporation Record). Attached hereto as Exhibit A is a list of Mortgage Loans we purchased from you which breached the "Early Default Representation/Warranty" provision contained in Section 5(f) of the MLPA. Pursuant to the MLPA you agreed to repurchase any Mortgage Loan for which the first or second scheduled monthly payment due to Purchaser following the related Closing Date on any Mortgage Loan is not made by the related mortgagor by the last day of the month for which it is due. The first or second mortgage payments for all the Mortgage Loans listed in Exhibit A was not made prior to last day of the month in which it was due. The MLPA requires you to repurchase all such loans at the Repurchase Price (as defined in the MLPA). Exhibit A states the Repurchase Price of each Mortgage Loan as of 4/30/07. In lieu of repurchase, we have also attached a repricing level for each mortgage loan in settlement of our claim against you. Also on Exhibit A is a list of Mortgage Loans we purchased from you which prepaid in full within one year of their respective Cut-Off date (as that term is defined in the MLPA). Section 5 (f) of the MLPA states that for any Mortgage Loan that is prepaid in full within one year of the related Cut-off Date, Seller shall pay to Purchaser within ten business days of Purchaser notifying Seller of such prepayment an amount equal to the product of the amount of such prepayment, times (b) the excess, if any, of the purchase price percentage, as set forth on Schedule Two of the respective Term Sheet, over 100%. Exhibit A contains the amounts due with respect to such Mortgage Loans Finally Exhibit A lists Mortgage Loans which breached Section 8 of the MLPA, which states, in part, "Prior to the related Transfer Date, all payments received by Seller on each Mortgage Loan shall be properly applied by Seller to the Account of the particular mortgagor. Any unapplied funds and suspense payments shall be wire transferred to Purchaser on the related Transfer Date…"

C-BASS has repeatedly sent demands to you for the repurchase and claims of the Mortgage Loans listed in Exhibit A. Contained in Exhibit A is the date on which our first demand for repurchase or claims were sent for each Mortgage Loan. As you can see these claims have been pending for a significant period of time. Since most of these claims relate to Early Payment Defaults the validity of these claims cannot be disputed.

I have been advised there where numerous communications between you and C-BASS to resolve these issues. Your firm, however, has failed to resolve the outstanding issues. We expect to receive payment on our claims as soon as possible and in any case by April 30, 2007. If we have not received payment of our claims by that date, we will take such actions with respect to these matters, as we deem appropriate, including instituting litigation against you.

Please contact me as soon as possible to discuss these matters. I hope that we can resolve these matters as promptly and amicably as possible.

Sincerely,

Scott Hendry
Deputy General Counsel
C-BASS LLC

CC:    Mr. Michael Barron
       2470 St. Rose Parkway, Suite 315
       Henderson, NV 89074

**EXHIBIT B**

**Service of Process:**
1:08-cv-01191-RWS Credit-Based Asset Servicing and Securitization LLC v. Allstate Home Loans, Inc.
ECF

MAR 3 1 2008

U.S.D.C. S.D.N.Y.
CASHIERS          U.S. District Court

### United States District Court for the Southern District of New York

### Notice of Electronic Filing

The following transaction was entered by Doherty, John on 3/31/2008 at 3:03 PM EDT and filed on 3/31/2008

| | |
|---|---|
| **Case Name:** | Credit-Based Asset Servicing and Securitization LLC v. Allstate Home Loans, Inc. |
| **Case Number:** | 1:08-cv-1191 |
| **Filer:** | Credit-Based Asset Servicing and Securitization LLC |
| **Document Number:** | 6 |

**Docket Text:**
**SUMMONS RETURNED EXECUTED Summons and Amended Complaint, served. Shearson Financial Network, Inc. served on 3/19/2008, answer due 4/8/2008. Service was accepted by Ina Feria. Document filed by Credit-Based Asset Servicing and Securitization LLC. (Doherty, John)**


**1:08-cv-1191 Notice has been electronically mailed to:**

John Patrick Doherty    jdoherty@tpw.com, mmuller@tpw.com

**1:08-cv-1191 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=3/31/2008] [FileNumber=4428317-0
] [257a216ffe5a28a59534dd491efc865d45ea754929fb54082775ed818e572cfc276
f3dc947cb273e6264857d48e1f632d023425333f69a07218ed1ad4c194a5c]]

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

**SUMMONS IN A CIVIL ACTION**

V.

ALLSTATE HOME LOANS, INC.,
SHEARSON FINANCIAL NETWORKS, INC.

CASE NUMBER:  08-CV-1191

TO: (Name and address of Defendant)

SHEARSON FINANCIAL NETWORKS, INC.
2470 St. Rose Parkway
Suite 314
Henderson, Nevada 89074

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

THACHER PROFFITT & WOOD LLP
Richard F. Hans
John P. Doherty

Two World Financial Center
New York, New York 10281
Tel.: (212) 912-7400

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

MAR 1 7 2008

CLERK                                              DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | 3/19/2008 |

| NAME OF SERVER (PRINT) | TITLE |
|---|---|
| Jay L. Stone | Process Server |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☒ Other (specify):
Personally Served Ina Feria for Shearson Financial Networks, Inc., at the address of 2470 St. Rose Pkwy., Ste. 314, Henderson, Nevada 89074.

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ___3/21/08___            _____
               /Date                  Signature of Server

Address of _____ *Professional Investigators Inc*

123 N. 9th STREET, LAS VEGAS, NV 89101
(702) 383-4008 (FAX) 383-0192

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

State of Nevada          )
                         ) ss.
County of Clark          )

## AFFIDAVIT OF SERVICE

**JAY L. STONE**, being duly sworn deposes and says:

1.  That at all times herein, your affiant is a citizen of the United States, over 18 years of age and not a party to nor interested within the action in which this affidavit is made. That your affiant is an employee of Professional Investigators Inc., which is licensed by the state of Nevada to serve legal process, License No.: 657-A.

2.  That on the 18 day March of 2008, your affiant received a copy of a United States District Court, Southern District of New York: Summons in a Civil Action and First Amended Complaint to be served on Shearson Financial Networks, Inc. at the address of 2470 St. Rose Pkwy., Ste. 314 Henderson Nevada 89074.

3.  That on the 19 day MARCH of 2008 your affiant served the United States District Court, Southern District of New York: Summons in a Civil Action and First Amended Complaint on Shearson Financial Networks, Inc. by personally leaving it with Ina Fenia for Shearson at the address of 2470 St. Rose Pkwy., Ste. 314 Henderson Nevada 89074.

4.  That your affiant swears under the penalty of New York that the foregoing statement is true and correct.

Affiant JAY L. STONE

Subscribed and Sworn before me this
The 20 day March of 2008.

Notary Public
County of Clark
State of Nevada

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
TIMOTHY DILLARD
Appt. No. 99-57559-1
My Appt. Expires Aug. 22, 2011

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC | **ECF CASE** |
| Plaintiff, | Civ. No. 08-1191 (RWS) |
| -against- | **CLERK'S CERTIFICATE** |
| ALLSTATE HOME LOANS, INC. and SHEARSON FINANCIAL NETWORK, INC., | |
| Defendants. | |

I., J. MICHAEL MCMAHON, Clerk of the United States District Court for the Southern District of New York, do hereby certify that this action commenced on February 5, 2008 with the filing of the Complaint against defendant Allstate Home Loans, Inc.; on March 17, 2008 the First Amended Complaint was filed and a Summons was issued for Defendant Shearson Financial Network, Inc.; a copy of the Summons and First Amended Complaint was served on Defendant Shearson Financial Network, Inc. on March 19, 2008 by personally serving Defendant at 2470 St. Rose Pkwy., Ste. 314, Henderson, Nevada 89074; and proof of such service was filed on March 31, 2008.

I further certify that the docket entries indicate that the Defendant has not filed an answer or otherwise moved with respect to the Complaint herein. The default of the Defendant is hereby noted.

Dated: New York, New York

April 9, 2008

J. MICHAEL MCMAHON
Clerk of the Court

By: _____
Deputy Clerk

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

                    Plaintiff,

              -against-

ALLSTATE HOME LOANS, INC. and
SHEARSON FINANCIAL NETWORK, INC.,

                Defendants.

**ECF CASE**

Civ. No. 08-1191 (RWS)

**STATEMENT OF DAMAGES**

Principal amount sued for ................................................$2,065,090.35

Attorneys' fees and costs.................................................$14,972.51

Total (as of April 16, 2008)...........................................$2,080,062.86[1]

---

[1] Plus interest as provided for in the Purchase Agreement.

**EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC,

                    Plaintiff,

           -against-

ALLSTATE HOME LOANS, INC. and
SHEARSON FINANCIAL NETWORK, INC.,

                  Defendants.

**ECF CASE**

Civ. No. 08-1191 (RWS)

**AFFIDAVIT OF JOHN P.
DOHERTY WITH RESPECT TO
ATTORNEYS' FEES AND COST**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

JOHN P. DOHERTY, being duly sworn, deposes and says:

1.     I am a member of Thacher Proffitt & Wood LLP ("TPW"), counsel for plaintiff Credit-Based Asset Servicing and Securitization LLC ("C-BASS"). I have never been the subject of a disciplinary proceeding or received any professional censure in connection with the practice of law. Unless otherwise noted, I have personal knowledge of the facts set forth herein based on my personal involvement in this lawsuit or based on TPW's books and records.

2.     I was admitted to the bar of the United States District Court for the Southern District of New York in 1997.

3.     TPW is a full-service commercial and financial services law firm. I am a business litigator and represent clients in commercial litigation matters, including loan-related litigation and workouts.

4.     TPW has served as counsel to C-BASS in this matter since July 2007. In that capacity, TPW provides advice and counsel concerning, and assists in enforcing, C-BASS's rights relating to certain agreements between C-BASS and Defendant, as described in the Complaint.

[TPW: NYLEGAL:755826.1] 17999-00685 04/15/2008 12:47 PM

5.     I submit this affidavit in support of C-BASS's application for attorneys' fees in this matter.

6.     I am the TPW partner who is principally responsible for this matter. I have personal knowledge of the legal fees and the costs incurred by C-BASS in this litigation.

7.     As a partner at TPW, I have direct access to TPW's attorney time-keeping system.

8.     Attached hereto are time details, redacted to protect attorney-client privilege or pursuant to the work product rule, setting forth the legal fees and expenses associated with this litigation. In no fashion should this affidavit be construed as a waiver of the attorney client privilege or the protections afforded by the work-product doctrine.

9.     The billing rates of TPW attorneys and paraprofessionals are located on a summary page at the end of each time detail.

10.     These fees were billed in accordance with TPW's billing rates and procedures. The rates charged by TPW for the services rendered by its professionals and paraprofessionals are the same or lower rates than TPW charges for professional and paraprofessional services rendered in comparable matters, because C-BASS generally received a discounted fee.

11.     The fees requested by TPW are reasonable based on the customary compensation charged by comparably skilled practitioners in similar matters in a competitive national legal market.

12.     TPW's billing records are generated by individuals with a professional and business responsibility to make and to keep them accurately, and it is, therefore, reasonable and

2

appropriate to rely upon them for information as to the actual and total legal fees and expenses incurred by or on behalf of C-BASS in enforcing its rights in this case.

13.    Disbursements include, but are not limited to: court fees, photocopying charges, telephone charges, mailing charges and ground transportation. A detailed schedule of such expenses -- which shows only the disbursements for which reimbursement is sought herein -- is included with each time detail.

14.    As more fully described in the attached statements, the fees and expenses incurred by TPW on C-BASS's behalf for this matter, through and including April 1, 2008, are $14,972.51. C-BASS reserves the right to supplement this application for attorneys' fees.

JOHN P. DOHERTY

Sworn to before me this
5th day of April 2008

Notary Public

CHRISTOPHER A. LYNCH
Notary Public, State of New York
No. 02LY6151597
Qualified in Queens County
Commission Expires Aug. 21, 2010

3

# THACHER PROFFITT & WOOD
## Detailed Billing Report Thru 12/06/07
### Prebill Number 268244

Printed 04/11/08 14:46:01
Page 1

Billing Attorney: 0670 Tvetenstrand, Paul D.

| Client | 17999 | Credit Based Asset Servicing & Securitization (C-BASS) | Last Date Billed | 12/18/07 |
|--------|-------|--------------------------------------------------------|------------------|----------|
| Matter | 00685 | Allstate Home Loan | Date Billed Thru | 03/17/08 |

**\*\*PROFESSIONAL SERVICES\*\*\*\***

| Time Id | Date | Description | Hours Worked | Tkpr No. | Timekeeper Name | Standard Value | Time Value | Running Total |
|---------|------|-------------|--------------|----------|-----------------|----------------|------------|---------------|
| 1629694 | 07/13/07 | Review complaint and discuss same with MHM. | 0.80 | 2893 | CA Lynch | 316.00 | 284.40 | 284.40 |
| 1688550 | 09/04/07 | Telephone conference with Mr. Hendry; work on complaints; email with Mr. Hendry. | 0.20 | 1466 | JP Doherty | 120.00 | 108.00 | 392.40 |
| 1708501 | 09/04/07 | Discuss assignment with JPD. Begin reviewing all files received from C-BASS; Begin drafting complaint. | 2.80 | 2203 | JS Kozar | 910.00 | 819.00 | 1,211.40 |
| 1710201 | 09/04/07 | Review additional documents provided by Scott Hendry, discuss needed information with JPD and prepare email to S. Hendry | 0.30 | 2893 | CA Lynch | 118.50 | 106.65 | 1,318.05 |
| 1708504 | 09/05/07 | Draft complaint and email to S. Hendry discussing same. | 1.60 | 2203 | JS Kozar | 520.00 | 468.00 | 1,786.05 |
| 1689555 | 09/07/07 | Work on complaints; emails with C-Bass. | 0.20 | 1466 | JP Doherty | 120.00 | 108.00 | 1,894.05 |
| 1689640 | 09/07/07 | Revise complaint; review emails. | 0.50 | 1466 | JP Doherty | 300.00 | 270.00 | 2,164.05 |
| 1708466 | 09/10/07 | Review email from S. Hendry. Revise portion of complaint discussing conversion. | 1.60 | 2203 | JS Kozar | 520.00 | 468.00 | 2,632.05 |
| 1692277 | 09/13/07 | Work on complaint; email client. | 0.30 | 1466 | JP Doherty | 180.00 | 162.00 | 2,794.05 |
| 1708478 | 09/13/07 | Office conference with JPD re: complaint. Revise complaint. | 0.80 | 2203 | JS Kozar | 260.00 | 234.00 | 3,028.05 |
| 1692278 | 09/14/07 | Work on complaint; email client. | 0.30 | 1466 | JP Doherty | 180.00 | 162.00 | 3,190.05 |
| 1708490 | 09/14/07 | Review Allstate complaint. Discuss same with JPD. | 0.30 | 2203 | JS Kozar | 114.00 | 102.60 | 3,292.65 |
| 1708446 | 09/17/07 | Revise complaint. Discuss same with JPD. | 1.20 | 2203 | JS Kozar | 456.00 | 410.40 | 3,703.05 |
| TIME TOTAL | | | 10.90 | | | $4,114.50 | | $3,703.05 |

## DISBURSEMENT SUMMARY

| Code | Description | Amount |
|------|-------------|--------|

| Disb Id | Date | Ref # | Code | Session # | Tkpr | Description | Amount | Running Total |
|---------|------|-------|------|-----------|------|-------------|--------|---------------|
| | | | | | | **\*\*\*DISBURSEMENTS\*\*\*** | | |
| 2077421 | 09/04/07 | 19 | 0 | | JSK | VENDOR: SeamlessWeb Professional Solutions, Inc. INVOICE#: 244884 DATE: 9/9/2007 Kozar ; | 29.09 | 29.09 |
| 2083615 | 09/13/07 | 19 | 0 | | JSK | VENDOR: SeamlessWeb Professional Solutions, Inc. INVOICE#: 245450 DATE: 9/16/2007 Kozar ; | 29.88 | 58.97 |
| 2097245 | 09/07/07 | 50 | 24414 | | JSK | VENDOR: J. KOZAR ; 2 WFC TO BARROW & HUDSON | 17.34 | 17.34 |

*Type Total* Overtime & Related Expense    58.97
*Type Total* Allstate Car Service    17.34

TOTAL DISBURSEMENTS    $76.31

THACHER PROFFITT & WOOD
Detailed Billing Report Thru 12/06/07
Prebill Number 268244

Printed 04/11/08 14:46:01
Page 2

Billing Attorney: 0670 Tvetenstrand, Paul D.

| Client | 17999 | Credit Based Asset Servicing & Securitization (C-BASS) | | Last Date Billed | |
|---|---|---|---|---|---|
| Matter | 00685 | Allstate Home Loan | | Date Billed Thru | 03/17/08 |

| Client | 19 | Overtime & Related Expense | 58.97 |
| Matter | 50 | Allstate Car Service | 17.34 |

**TOTAL DISBURSEMENTS** $76.31

**TIMEKEEPER SUMMARY**

| Atty | Status | Timekeeper | Avg Rate | Hours | Std Value | Time Value | Last Entry |
|---|---|---|---|---|---|---|---|
| 1466 | Partner | Doherty, John P. | 540.00 | 1.50 | 900.00 | 810.00 | 09/14/07 |
| | | *Total Partner* | | 1.50 | 900.00 | 810.00 | |
| 2203 | Associate | Kozar, Jennifer S. | 301.45 | 8.30 | 2,780.00 | 2,502.00 | 09/17/07 |
| 2893 | Associate | Lynch, Christopher A. | 355.50 | 1.10 | 434.50 | 391.05 | 09/04/07 |
| | | *Total Associate* | | 9.40 | 3,214.50 | 2,893.05 | |

**TIME TOTAL** 10.90 $4,114.50 $3,703.05

| Total Fees | 3,703.05 | OA Fees Balance | 0.00 | Unapplied Cash Balance | 0.00 |
| Total Disbursements | 76.31 | OA Disb Balance | 0.00 | Retainer Balance | 0.00 |
| Total Fees and Disbursements | 3,779.36 | Advance Fee Balance | 0.00 | Escrow Balance | 0.00 |
| A/R Balance | 0.00 | | | | |

**Matter Billing History**

| | Year To Date | | Since Inception | | |
|---|---|---|---|---|---|
| | Fees | Disbursements | Fees | Disbursements | Date |
| Total Fees | 3,703.05 | 0.00 | 3,703.05 | | |
| Total Disbursements | | 76.31 | | 76.31 | |
| | | | | | Last Bill/Payment |
| Amount Billed | 0.00 | 0.00 | 3,703.05 | 76.31 | 12/18/07 |
| Amount Received | 0.00 | 0.00 | | | 02/26/08 |
| Last Bill Amount | 3,703.05 | 76.31 | | | 12/18/07 |

**THACHER PROFFITT & WOOD**

Detailed Billing Report Thru 04/11/08

Prebill Number 287858

Printed 04/11/08  14:23:32

Page 1

Billing Attorney: 0670 Tweetenstrand, Paul D.

| Client | 17999 | | Last Date Billed | 12/18/07 |
| Matter | 00685 | Allstate Home Loan | Date Billed Thru | 03/17/08 |

Credit Based Asset Servicing & Securitization (C-BASS)

| Time Id | Date | | Hours Worked | Tkpr No. | Timekeeper Name | Standard Value | Time Value | Running Total |
|---|---|---|---|---|---|---|---|---|
| | | ***PROFESSIONAL SERVICES*** | | | | | | |
| 1834223 | 01/30/08 | Telephone conference with client; meet with CAL regarding complaint; emails with client. | 1.00 | 1466 | JP Doherty | 650.00 | 585.00 | 585.00 |
| 1823394 | 01/30/08 | Discuss complaint with JPD and revise same to reflect updated figures. Prepare for filing; discuss ' with JPD and email to client on concerns of same. | 1.40 | 2893 | CA Lynch | 630.00 | 567.00 | 1,152.00 |
| 1818731 | 01/31/08 | Prepare Summons and Civil Cover Sheets with respect to Defendant Allstate Home Loans, Inc. | 0.50 | 1586 | JN Novikov-Carles | 87.50 | 78.75 | 1,230.75 |
| 1823250 | 01/31/08 | Revise complaint and rule 7.1 statement. | 0.30 | 2893 | CA Lynch | 135.00 | 121.50 | 1,352.25 |
| 1824626 | 02/05/08 | Purchased index number and rule 7.1 Complaint. | 1.10 | 0979 | JE Wilson | 82.50 | 74.25 | 1,426.50 |
| 1846503 | 02/05/08 | Prepare and Civil Cover Sheet with the Cashier's Office in SDNY; emails Locate demand letter and send to CAL; emails with CAL re: same. | 0.20 | 2203 | JS Kozar | 76.00 | 68.40 | 1,494.90 |
| 1832594 | 02/05/08 | Revise complaint, review exhibits and prepare for and coordinate filing of action; prepare email to Scott Hendry on same. | 1.80 | 2893 | CA Lynch | 810.00 | 729.00 | 2,223.90 |
| 1828164 | 02/06/08 | Review filed complaint and court notices. | 0.20 | 1466 | JP Doherty | 130.00 | 117.00 | 2,340.90 |
| 1833013 | 02/13/08 | Work on service issues; review meet with CAL. | 0.50 | 1466 | JP Doherty | 325.00 | 292.50 | 2,633.40 |
| 1844513 | 02/13/08 | Discuss service issues with MM, review and prepare | 1.50 | 2893 | CA Lynch | 675.00 | 607.50 | 3,240.90 |
| 1831970 | 02/18/08 | status email to JPD on the same. Review issues. | 1.50 | 2893 | CA Lynch | 675.00 | 607.50 | 3,848.40 |
| 1837615 | 02/19/08 | Follow up regarding service of process. and research | 0.30 | 1466 | JP Doherty | 195.00 | 175.50 | 4,023.90 |
| 1844240 | 02/19/08 | Discuss alternative service upon agent with MM and BSZ; research agent information/alternative business locations; prepare email to JPD on same. | 1.00 | 2893 | CA Lynch | 450.00 | 405.00 | 4,428.90 |
| 1833995 | 02/20/08 | Revise and prepare Summons related to Allstate Home Loan. | 0.20 | 1586 | JN Novikov-Carles | 35.00 | 31.50 | 4,460.40 |
| 1834064 | 02/20/08 | Discuss status of service with JPD and arrange for service on defendant's agent. | 0.40 | 2893 | CA Lynch | 180.00 | 162.00 | 4,622.40 |
| 1846249 | 02/21/08 | Follow up service of process. | 0.20 | 1466 | JP Doherty | 130.00 | 117.00 | 4,739.40 |
| 1837809 | 02/25/08 | Emails with CAL; follow up regarding service of process. | 0.20 | 1466 | JP Doherty | 130.00 | 117.00 | 4,856.40 |
| 1836821 | 02/25/08 | Follow up on service issues and prepare email to Scott Hendry. | 0.30 | 2893 | CA Lynch | 135.00 | 121.50 | 4,977.90 |
| 1846290 | 02/26/08 | Email with Mr. Hendry; follow up call. | 0.50 | 1466 | JP Doherty | 325.00 | 292.50 | 5,270.40 |
| 1838223 | 02/26/08 | Review | 0.40 | 2893 | CA Lynch | 180.00 | 162.00 | 5,432.40 |

THACHER PROFFITT & WOOD
Detailed Billing Report Thru 04/11/08
Prebill Number 287858

Printed 04/11/08 14:23:32
Page 2

Billing Attorney: 0670 Tveteenstrand, Paul D.

| Client | 17999 | Credit Based Asset Servicing & Securitization (C-BASS) | Last Date Billed | 12/18/07 |
|---|---|---|---|---|
| Matter | 00685 | Allstate Home Loan | Date Billed Thru | 03/17/08 |

***PROFESSIONAL SERVICES***

| Time Id | Date | | Hours Worked | Tkpr No. | Timekeeper Name | Standard Value | Time Value | Running Total |
|---|---|---|---|---|---|---|---|---|
| 1843778 | 02/29/08 | Research. | 0.50 | 2893 | CAL Lynch | 225.00 | 202.50 | 5,634.90 |
| 1849038 | 03/03/08 | Follow up with CAL regarding suit against Stratton. | 0.60 | 1466 | JP Doherty | 390.00 | 351.00 | 5,985.90 |
| 1864582 | 03/03/08 | Research. Analyze email with Mr. Hendry. Discuss conference with Mr. CAL on same and prepare email to Scott Hendry regarding conclusion. | 3.50 | 2893 | CAL Lynch | 1,575.00 | 1,417.50 | 7,403.40 |
| 1844757 | 03/04/08 | Filed original Summons with Proof of Service with Cashier's Office in SDNY. | 0.60 | 0979 | JE Wilson | 45.00 | 40.50 | 7,443.90 |
| 1849142 | 03/04/08 | Work on complaint. | 0.50 | 1466 | JP Doherty | 325.00 | 292.50 | 7,736.40 |
| 1866096 | 03/04/08 | | 0.30 | 2893 | CAL Lynch | 135.00 | 121.50 | 7,857.90 |
| 1851040 | 03/07/08 | Telephone conference with CAL; outline telephone conference with Mr. Hendry. | 0.30 | 1466 | JP Doherty | 195.00 | 175.50 | 8,033.40 |
| 1852674 | 03/10/08 | Work on complaint. | 0.10 | 1466 | JP Doherty | 65.00 | 58.50 | 8,091.90 |
| 1852694 | 03/11/08 | Work on revised complaint. | 0.20 | 1466 | JP Doherty | 130.00 | 117.00 | 8,208.90 |
| 1867861 | 03/13/08 | Email to Scott Hendry | 0.10 | 2893 | CAL Lynch | 45.00 | 40.50 | 8,249.40 |
| 1851121 | 03/14/08 | revise amended complaint; telephone conference with Mr. Hendry; meet with CAL. | 0.60 | 1466 | JP Doherty | 390.00 | 351.00 | 8,600.40 |
| 1867869 | 03/14/08 | Review case law revise amended complaint accordingly; research and discuss with JPD. | 2.50 | 2893 | CAL Lynch | 1,125.00 | 1,012.50 | 9,612.90 |
| 1854176 | 03/17/08 | Filed First Amended Complaint and Summons issued by clerk in Cashier's Office in SDNY. | 0.90 | 0979 | JE Wilson | 67.50 | 60.75 | 9,673.65 |
| 1854338 | 03/17/08 | Review amended complaint; meet with CAL; oversee filing and service. | 0.30 | 1466 | JP Doherty | 195.00 | 175.50 | 9,849.15 |
| 1855217 | 03/17/08 | Prepare documents. | 0.20 | 1586 | JN Novikov-Carles | 35.00 | 31.50 | 9,880.65 |
| 1854335 | 03/17/08 | Finalize first amended complaint and address filing and service issues with same. | 0.80 | 2893 | CAL Lynch | 360.00 | 324.00 | 10,204.65 |
| 1862464 | 03/31/08 | Filed Affidavits of Service with the clerk in the Cashier's Office in SDNY. | 0.60 | 0979 | JE Wilson | 45.00 | 40.50 | 10,245.15 |
| TIME TOTAL | | | 26.10 | | | $11,383.50 | | $10,245.15 |

***DISBURSEMENTS***

| Disb Id | Date | Ref # | Code | Session # | Tkpr | | Amount |
|---|---|---|---|---|---|---|---|
| 2235780 | 02/05/08 | | 01 | 26540 | CAL | Copy; Lg. 202 Page(s) | 44.44 |
| 2235781 | 02/05/08 | | 01 | 26540 | MM | Copy; Lg. 12 Page(s) | 2.64 |
| 2271189 | 03/13/08 | | 01 | 27190 | CAL | Copy; Lg. 5 Page(s) | 1.10 |

## THACHER PROFFITT & WOOD
Detailed Billing Report Thru 04/11/08
Prebill Number 287858

Printed 04/11/08 14:23:52
Page 3

Billing Attorney: 0670 Tvetenstrand, Paul D.

| Client | 17999 | Credit Based Asset Servicing & Securitization (C-BASS) | Last Date Billed | 12/18/07 |
|---|---|---|---|---|
| Matter | 00685 | Allstate Home Loan | Date Billed Thru | 03/17/08 |

### ***DISBURSEMENTS***

| Disb Id | Date | Ref # | Code | Session # | Tkpr | | Amount | Amount |
|---|---|---|---|---|---|---|---|---|
| 2275602 | 03/17/08 | | 01 | 27235 | CAL | Copy; 1.g, 152 Page(s) | 33.44 | |
| | | | | | | *Type Total* Duplicating | | 81.62 |
| 2250974 | 02/21/08 | | 04 | 26820 | MM | Number Dialed: 1(916)446-2051, Destination: | 0.04 | |
| 2251056 | 02/21/08 | | 04 | 26820 | MM | CALIFORN, CA, Duration: 15 seconds | 0.00 | |
| | | | | | | Number Dialed: 1(916)441-3100, Destination: | | |
| 2251059 | 02/21/08 | | 04 | 26820 | MM | CALIFORN, CA, Duration: 6 seconds | 0.30 | |
| | | | | | | Number Dialed: 1(916)446-4890, Destination: | | |
| 2273407 | 03/17/08 | | 04 | 27229 | MM | CALIFORN, CA, Duration: 111 seconds | 0.34 | |
| | | | | | | Number Dialed: 1(702)383-4005, Destination: | | |
| 2276958 | 03/20/08 | | 04 | 27289 | MM | NEVADA, NV, Duration: 137 seconds | 0.08 | |
| | | | | | | Number Dialed: 1(702)383-4005, Destination: | | |
| 2282977 | 03/01/08 | 14 | | 27369 | CAL | NEVADA, NV, Duration: 37 seconds | 0.76 | |
| | | | | | | *Type Total* Telephone | | |
| | | | | | | Westlaw research charges from invoice #815495991 | 333.74 | 333.74 |
| | | | | | | for period 02/01/08 - 02/29/08. Research done by | | |
| | | | | | | Christopher Lynch on 2/08/08. | | |
| | | | | | | *Type Total* Legal Research/Westlaw | | |
| 2276492 | 03/13/08 | 19 | | 0 | CAL | VENDOR: Seamless Web Professional Solutions, | 22.58 | 22.58 |
| | | | | | | Inc. INVOICE#: 315889 DATE: 3/16/2008 | | |
| | | | | | | Lynch ; | | |
| | | | | | | *Type Total* Overtime & Related Expense | | |
| 2254173 | 02/26/08 | 25 | | 0 | MM | VENDOR: Premier Legal Solutions; INVOICE#: | 67.40 | 67.40 |
| | | | | | | 0212008; DATE: 2/26/2008 - Court Reporting & | | |
| | | | | | | Transcript fees | | |
| | | | | | | *Type Total* Court Reporter/Transcript | | |
| 2284130 | 03/20/08 | 28 | | 0 | MM | VENDOR: Professional Investigators Inc.; | 91.90 | 91.90 |
| | | | | | | INVOICE#: 0803109; DATE: 3/20/2008 - | | |
| | | | | | | Shearson Financial Networks, Inc on 3/19/08 | | |
| | | | | | | *Type Total* Expert Fees | | |
| 2230833 | 01/31/08 | 30 | | 0 | MM | VENDOR: Clerk of the Court, U.S.District Court S; | 350.00 | 350.00 |
| | | | | | | INVOICE#: 01312008; DATE: 1/31/2008 - | | |
| | | | | | | FILING FEE | | |
| | | | | | | *Type Total* Miscellaneous Filing Fee | | |
| | | | | | | TOTAL DISBURSEMENTS | | $948.00 |

### DISBURSEMENT SUMMARY

| Code | Description | Amount |
|---|---|---|
| 01 | Duplicating | 81.62 |
| 04 | Telephone | 0.76 |
| 14 | Legal Research/Westlaw | 333.74 |

# THACHER PROFFITT & WOOD
### Detailed Billing Report Thru 04/11/08
### Prebill Number 287858

Printed 04/11/08 14:23:32
Page: 4

Billing Attorney: 0670 Tvetenstrand, Paul D.

| Client | 17999 | Credit Based Asset Servicing & Securitization (C-BASS) | Last Date Billed | 12/18/07 |
|--------|-------|-----------------------------------------------------------|------------------|----------|
| Matter | 00685 | Allstate Home Loan | Date Billed Thru | 03/17/08 |

## TIMEKEEPER SUMMARY

| Atty | Status | Timekeeper | Avg Rate | Hours | Std Value | Time Value | Last Entry |
|------|--------|------------|----------|-------|-----------|------------|------------|
| 1466 | Partner | Doherty, John P. | 585.00 | 5.50 | 3,575.00 | 3,217.50 | 03/17/08 |
|  |  | *Total Partner* |  | 5.50 | 3,575.00 | 3,217.50 |  |
| 2203 | Associate | Kozar, Jennifer S. | 342.00 | 0.20 | 76.00 | 68.40 | 02/05/08 |
| 2893 | Associate | Lynch, Christopher A. | 405.00 | 16.30 | 7,335.00 | 6,601.50 | 03/17/08 |
|  |  | *Total Associate* |  | 16.50 | 7,411.00 | 6,669.90 |  |
| 1586 | Legal Assistant | Novikov-Carles, Jaskeline N. | 157.50 | 0.90 | 157.50 | 141.75 | 03/17/08 |
|  |  | *Total Legal Assistant* |  | 0.90 | 157.50 | 141.75 |  |
| 0979 | Administrative | Wilson, Jonathan E. | 67.50 | 3.20 | 240.00 | 216.00 | 03/31/08 |
|  |  | *Total Administrative* |  | 3.20 | 240.00 | 216.00 |  |
| TIME TOTAL |  |  |  | 26.10 | $11,383.50 | $10,245.15 |  |

| | | |
|----|----------------------------|--------|
| 19 | Overtime & Related Expense | 22.58 |
| 25 | Court Reporter/Transcript | 67.40 |
| 28 | Expert Fees | 91.90 |
| 30 | Miscellaneous Filing Fee | 350.00 |
| TOTAL DISBURSEMENTS | | $948.00 |

| Total Fees | 10,245.15 | O.A Fees Balance | 0.00 | Unapplied Cash Balance | 0.00 |
|------------|-----------|------------------|------|------------------------|------|
| Total Disbursements | 948.00 | O.A. Disb Balance | 0.00 | Retainer Balance | 0.00 |
| Total Fees and Disbursements | 11,193.15 | Advance Fee Balance | 0.00 | Escrow Balance | 0.00 |
| A/R Balance | 0.00 | | | | |

### Matter Billing History

| | Year To Date | | Since Inception | | Last Bill/Payment |
|---|---|---|---|---|---|
| | Fees | Disbursements | Fees | Disbursements | Date |
| Amount Billed | 0.00 | 0.00 | 3,703.05 | 76.31 | 12/18/07 |
| Amount Received | 0.00 | 0.00 | 3,703.05 | 76.31 | 02/26/08 |
| Last Bill Amount | 3,703.05 | 76.31 | | | 12/18/07 |

**EXHIBIT F**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC

                Plaintiff,

          -against-

ALLSTATE HOME LOANS, INC. and
SHEARSON FINANCIAL NETWORK, INC.,

                Defendants.

**ECF CASE**

Civ. No. 08-1191 (RWS)

---

### DEFAULT JUDGMENT

      This action having been commenced on February 5, 2008 with the filing of the Complaint against defendant Allstate Home Loans, Inc.; on March 17, 2008 the First Amended Complaint was filed and a Summons was issued for Defendant Shearson Financial Network, Inc.; a copy of the Summons and First Amended Complaint was served on Defendant Shearson Financial Network, Inc. on March 19, 2008 by personally serving Defendant at 2470 St. Rose Pkwy., Ste. 314, Henderson, Nevada 89074; proof of such service was filed on March 31, 2008; and the Defendant not having answered the Complaint, and the time for answering the Complaint having expired, it is

      **ORDERED** that Plaintiff have judgment against Defendant in the liquidated amount of $2,065,090.35 and attorneys' fees and costs in the amount of $14,972.51, amounting in all to $2,080,062.86, plus interest as set forth in the Purchase Agreement[1]; and it is further

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Complaint.

**ORDERED** that within thirty (30) days following payment in full of the amount awarded by this Default Judgment, Plaintiff shall return to Defendant the Early Payment Default Loans as set forth in the Purchase Agreement.

Dated: New York, New York

_____

_____

**United States District Judge**

2